# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEN DEKUI,  CHEN DESHENG, CHEN HONGWEN, CHEN JIAMING, CHEN JIAWEI, CHEN SHIHUI, CHEN WENCONG, CHEN XIMING, CHEN YANYUI, HAN SENDING, HUAN FENGQI, LI CHANGZHOU, LI ZHIYONG, LIAO CHUANBIAO, LIU DEQIANG, QIU FAXIN, SU JINHUA, WANG CHUANQUAN, WANG QI, WANG SHEN, WANG XIANFAN, WANG YUBEN, XIAO WEI, ZHANG LINGJIE, ZHENG BINHONG, and ZHU WENQIANG, <br><br>      Plaintiffs, <br><br> v. <br><br> BRAG HOUSE HOLDINGS, INC., LAVELL JUAN MALLOY, II, MALLOY FAMILY TRUST, DANIEL LEIBOVICH, LEIBOVICH FAMILY TRUST, KINGSWOOD CAPITAL PARTNERS, LLC, <br><br>      Defendants. | Case No. 26-cv-1840 <br><br> **COMPLAINT** |

## COMPLAINT

1.      This is a federal securities lawsuit.  The plaintiffs are individual investors (the "Plaintiffs") who in March 2025 were deceived into investing over $3 million, at a price of $4 per share, in the Initial Public Offering ("IPO") of Brag House Holdings, Inc. ("Brag" or the "Company"), a microcap growth company whose NASDAQ-listed stock (ticker: TBH) plunged to under $1 by early April 2025 and, as of March 5, 2025, trades for ~30 cents per share.

2.      Plaintiffs assert strict liability claims under § 12(a)(2) and § 15 of the  Securities Act of 1933 Act (the "Securities Act"), as well as various claims under state securities and common law, against Defendants Brag, Malloy, Leibovich, and Kingswood, all of whom made or signed, and/or had authority over the contents of, the written and oral statements that the Company used to solicit the Plaintiffs' IPO purchases (the "Offering Materials").  Plaintiffs'

Securities Act claims in Counts One and Two—as well as state law claims in Counts Three, Four, Five, Six, and Seven—are not based on any allegation of deliberate or intentional misconduct. Plaintiffs expressly disclaim any reference or reliance upon fraud allegations for such claims, which are entirely separate and distinct from the fraud-based claims brought in the alternative.

3.     In the alternative, Plaintiffs bring fraud-based claims under § 10(b) and  § 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and under SEC Rule 10b-5 promulgated thereunder, *see* 17 C.F.R. § 240.10b-5, in Counts Eight and Nine; and under state law in Counts Ten and Eleven. Plaintiffs bring those alternative fraud-based claims against Defendants Brag, Malloy, Malloy Family Trust, Leibovich, Leibovich Family Trust), and Kingswood.

**INTRODUCTION**

4.     Plaintiffs were the primary outside investors in Brag's IPO.  As further described below, during the final several months of Brag's solicitation of the Plaintiffs' IPO investments, and at the time Brag secured those IPO investments, Brag did not have any alternative investors in line to fund the IPO if Plaintiffs declined to invest.  Without Plaintiffs' IPO investments, Brag's IPO would have failed to launch, and the Company shortly thereafter would have imploded due to a lack of capital and inability to generate income.

5.     The fraud scheme that induced Plaintiffs to invest in Brag's IPO was orchestrated by Brag's co-founders Lavell Juan Malloy, II and Daniel Leibovich.  Malloy and Leibovich are the company's Chief Executive Officer ("CEO") and Chief Operating Officer ("COO"), respectively. They also sit on and have substantial influence over the company's Board of Directors.  They are also significant shareholders of Brag, holding their shares in revocable trusts (Malloy Family Trust and Leibovich Family Trust).  Malloy and Leibovich thus stood to benefit handsomely if Brag successfully completed an IPO, and they stood to lose significant wealth if Brag's IPO failed.

6.     To solicit Plaintiffs' IPO investments, and all in relation to the Company's IPO prospectus, Malloy and Leibovich did the following:

a.   First, they promised to Plaintiffs, through both written and oral statements they

2

made to individuals they knew were acting as Plaintiffs' intermediaries and representatives and would pass those statements on to Plaintiffs (hereinafter "Plaintiffs' Intermediary"), that, shortly after the IPO closed, Brag would undertake a lawful corporate restructuring to transfer Brag's pre-IPO assets and liabilities to a new subsidiary and then spin that subsidiary out as a new private entity. That transaction, once consummated, would leave Brag as a debt-free, publicly-traded entity positioned to bring in new management and either obtain a new round of financing to fund a change in direction or engage in profitable business combinations.

b. Second, they presented Plaintiffs, through communications to Plaintiffs' Intermediary, with false power of attorney forms purporting to show that Brag's pre-IPO shareholders had transferred their voting powers to Scott Woller, Esq., whom Malloy represented to be Brag's outside counsel and his close confidante.

c. Third, they represented to Plaintiffs, through communications to Plaintiffs' Intermediary, that Woller, acting as the pre-IPO shareholders' attorney-in-fact, would cause the pre-IPO shareholders to transfer their pre-IPO shares in the Company to Plaintiffs as part of the post-IPO spinoff transaction, in exchange for which Plaintiffs would transfer to Brag's pre-IPO shareholders all of Plaintiffs' interests in the spun out entity.

d. Fourth, they falsely stated to Plaintiffs, through communications to Plaintiffs' Intermediary, that the Brag would not spend, other than to cover the transaction costs associated with the spinoff transaction described above, any of the cash proceeds generated by the IPO.

7. Through communications that Plaintiffs' Intermediary conveyed to Malloy, Leibovich, and Brag's lead IPO underwriter Kingswood Capital Partners ("Kingswood"), Plaintiffs made clear that they were highly skeptical of Brag's then-present business model and

management and that they would not invest in Brag's IPO absent assurances that Brag would consummate the spinoff transaction described above. Although Plaintiffs understood that their IPO purchases would comprise only 50% of the shares the Company would be issuing as part of the IPO (which also would total less than 5% of the Company's shares that would be outstanding as of the close of the IPO), Brag advised Plaintiffs, through communications to Plaintiffs' Intermediary, that a second group of investors who had tentatively agreed to purchase the other 50% of Brag's IPO shares were aware of Plaintiffs' investment conditions (*i.e.*, that Plaintiffs would invest in the IPO only upon assurance of the spinoff transaction described above), were in full agreement that said spinoff transaction would be in the best interests of Brag's shareholders, and also were in favor of and would support said spinoff transaction after the closing of the IPO. Plaintiffs also understood that, if Plaintiffs declined to invest in the IPO, this second group of investors would decline as well.

8.    Malloy and Leibovich had caused Brag to hire Kingswood as the lead underwriter and sole bookrunning agent for the Brag IPO.  Kingswood's work on the Brag IPO was spearheaded by its President of Investment Banking (the "Kingswood Executive"), the identify of whom is known to all defendants.  Through the Kingswood Executive, Kingswood knowingly, recklessly, or negligently helped convey Brag's, Malloy's, and Leibovich's false representations to Plaintiffs.  Kingswood—which stood to receive lucrative fees from Brag if the IPO closed, as well as the right to purchase discounted IPO shares—thus helped facilitate the false representations that Brag, Malloy, and Leibovich made and caused to be made to Plaintiffs to induce their IPO investments.

9.    These representations and promises were material to each Investor Plaintiff's investment decision, because each Investor Plaintiff reasonably considered Brag's pre-IPO assets to be essentially worthless and Brag's current management team to be unqualified to turn the Company around.  Brag had not been able to generate material income in the past, and they had no realistic hope of generating material income in the future.  Brag's then-present business focus was also capital intensive, which meant that continuing with that business model after the closing

of an IPO would quickly dissipate the IPO proceeds.  Each Investor Plaintiff considered Brag's IPO shares to be attractive from an investment perspective only because the proposed spinoff transaction (inclusive of the transfer aspect of the transaction, wherein each Investor Plaintiff would receive pre-IPO shareholders' Brag shares in exchange for that Investor Plaintiff's shares in the spunoff entity) would provide Plaintiffs with a substantial ownership position in a debt-free, publicly-traded entity that could bring in new management and would be ideally suited for future financing or business combination opportunities.  This debt-free, publicly-traded entity would also retain the lion's share of the cash proceeds generated by the IPO, which gave Plaintiffs confidence that the IPO capital they would be investing into Brag would not be squandered by Brag's then-present management on Brag's then-present business model or some other ill-conceived growth strategy.

10.    None of Malloy's, Leibovich's, or Kingswood's representations to Plaintiffs regarding the post-IPO spinoff transaction or pre-IPO shareholders' share transfers were truthful, but rather were inaccurate, false, and misleading.

11.    In truth and in fact, Malloy and Leibovich (i) never intended for the spinoff transaction to occur, and (ii) presented to Plaintiffs, through communications to Plaintiffs' Intermediary, with the power of attorney forms that, although purporting to appoint Woller as the non-insider pre-IPO shareholders' attorney-in-fact with respect to any transfer of the shareholders' pre-IPO Brag shares, had not been validly executed with approval and authorization of those pre-IPO shareholders.

12.    Plaintiffs, who were receiving information through Plaintiffs' Intermediary, began learning the truth after the Brag IPO was completed.  Through Plaintiffs' Intermediary, Plaintiffs learned the following facts:

      a.  First, contrary to the false promises that, through communications to Plaintiffs' Intermediary, Malloy and Leibovich made to Plaintiffs to induce Plaintiffs' investments, Malloy and Leibovich did nothing to pursue the spinoff transaction after the IPO closed.

b.  Second, without providing an explanation, on March 21, 2025 (two weeks after the close of the IPO), Malloy informed Plaintiffs, through communications to Plaintiffs' Intermediary, that the executed power of attorney forms described above were being revoked and withdrawn.  In doing so, however, Malloy did not inform Plaintiffs that the spinoff transaction and share transfer would not be consummated at promised.  Rather, Malloy continued to lull Plaintiffs into believing those transactions would be consummated at promised, which resulted in Plaintiffs continuing to hold their Brag shares.  Unfortunately, on April 1, 2025, the price of Brag's share plummeted, going from an opening price of $6.21 per share to $1.13 in just a few hours,  after Brag filed a pre-market 8-K stating that it was unable to meet its SEC 10-K reporting deadlines.

c.  Third, in early August 2025, Malloy caused Brag to engage in a secondary issuance of preferred stock and warrants that massively diluted Plaintiffs' shares.  This secondary issuance, which must have been in the words for many months, was flatly inconsistent with the spinoff transaction and share transfer plan that Malloy had promised to Plaintiffs in order to induce Plaintiffs' IPO investments.  It also rendered the spinoff transaction and share transfer plan an impossibility.

d.  Fourth, shortly after the August 2025 secondary issuance was announced by Brag, Plaintiffs learned through communications between their counsel and one of Brag's largest pre-IPO shareholders (the identify of whom is known to all defendants) that the executed power of attorney forms purporting to transfer that pre-IPO shareholder's voting authority to Scott Woller, Esq. had been prepared and executed without that pre-IPO shareholders' knowledge or approval, which meant that the form was false and fraudulent.  This shocking revelation confirmed that the representations that Malloy and Leibovich used to solicit and secure Plaintiffs' investments in Brag's IPO had been totally

untrue. On information and belief, none of Brag's non-insider pre-IPO shareholders actually had granted power of attorney to Woller, and Malloy's and Leibovich's representations to the contrary were false and were made solely to induce Plaintiffs' IPO investments.

13.    After learning that the spinoff transaction and share transfer plan were false promises, Plaintiffs sold their Brag shares in the open market in hopes of minimizing their still-substantial economic losses.

14.    Plaintiffs' substantial losses were proximately caused by Defendants' unlawful conduct, because they would not have invested in the IPO at all but for the false promises and representations regarding the post-IPO spinoff transaction described above.

## THE PARTIES

15. Plaintiff Chen Dekui is an individual residing in Hong Kong.

16. Plaintiff Chen Desheng is an individual residing in Hong Kong.

17. Plaintiff Chen Hongwen in an individual residing in Hong Kong.

18. Plaintiff Chen Jiaming is an individual residing in Hong Kong.

19. Plaintiff Chen Jiawei is an individual residing in Hong Kong.

20. Plaintiff Chen Shihui is an individual residing in Hong Kong.

21. Plaintiff Chen Wencong is an individual residing in Hong Kong.

22. Plaintiff Chen Ximing is an individual residing in Hong Kong.

23. Plaintiff Chen Yanyui is an individual residing in Hong Kong.

24. Plaintiff Han Sending is an individual residing in Hong Kong.

25. Plaintiff Huan Fengqi is an individual residing in Hong Kong.

26. Plaintiff Li Changzhou is an individual residing in Hong Kong.

27. Plaintif Li Zhiyong is an individual residing in Hong Kong.

28. Plaintiff Liao Chuanbiao is an individual residing in Hong Kong.

29. Plaintiff Liu Deqiang is an individual residing in Hong Kong.

30. Plaintiff Qiu Faxin is an individual residing in Hong Kong.

31. Plaintiff Su Jinhua is an individual residing in Hong Kong.

32. Plaintiff Wang Chaunquan is an individual residing in Hong Kong.

33. Plaintiff Wang Qi is an individual residing in Hong Kong.

34. Plaintiff Wang Shen is an individual residing in Hong Kong.

35. Plaintiff Wang Xianfan is an individual residing in Hong Kong.

36. Plaintif Wang Yuben is an individual residing in Hong Kong.

37. Plaintiff Xiao Wei is an individual residing in Hong Kong.

38. Plaintiff Zhang Lingjle is an individual residing in Hong Kong.

39. Plaintif Zheng Binhong is an individual residing in Hong Kong.

40. Plaintiff Zhu Wenqiang is an individual residing in Hong Kong.

41. The plaintiffs listed in the paragraphs aboved are collectively referred to herein as "Plaintiffs."

42. Defendant Brag House Holding, Inc. ("Brag") is a Delaware corporation that claims a physical office address in New Jersey. That physical office is, in fact, the office space of one of the company's outside counsel. Brag itself has a fully remote work policy. Brag trades on the NASDAQ exchange under the ticker symbol TBH.

43. Defendant Lavell Juan Malloy, II is the co-founder and Chief Executive Officer of Brag and also is a member of Brag's Board of Directors. On information and belief, Malloy resides in Schenectady, New York.

44. Defendant Malloy Family Trust is, on information and belief, a New York trust that is controlled by Malloy. The Malloy Family Trust holds Malloy's pre-IPO shares of Brag.

45. Defendant Daniel Leibovich is the co-founder and Chief Operating Officer of Brag, and also is a member of Brag's Board of Directors. On information and belief, Leibovich resides in New York state.

46. Defendant Leibovich Family Trust is, on information and belief, a New York trust that is controlled by Leibovich. The Leibovich Family Trust holds Leibovich's pre-IPO

8

shares of Brag.

47. Kingswood Capital Partners, LLC is a Nevada limited liability company with headquarted in San Diego, California and with a significant office in Manhattan, New York.

## JURISDICTION AND VENUE

48. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over Plaintiffs' claims under the Securities Act and Exchange Act.

49. The Court has subject matter jurisdiction under 28 U.S.C. § 1332 over Plaintiffs' state law claims because the amount in controversy exceeds $75,000 and there is complete diversity between the parties. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims.

50. This Court has personal jurisdiction over each of the defendants because each defendant either resides in New York or purposefully availed itself of New York with respect to the transactions from which Plaintiffs' claim arise. Furthermore, the defendants are based in the United States and, in turn, have minimum contacts with the United States as a whole, and such nationwide contacts are sufficient to confer personal jurisdiction under the Securities Act and Exchange Act.

51. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because, as further described herein, a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

## FACTS

I. **Brag's Initial Unsuccessful Attempts at an IPO**

52. In 2018, Malloy (Brag's co-founder, CEO, and Board member) and Leibovich (Brag's co-founder, COO, and Board member) developed an idea for a video gaming and esports "vertically integrated social network for casual college gamers to compete, support their team, talk trash in a safe environment and win prizes."

53. In December 2021, Malloy and Leibovich formed Brag for the purposes of developing,

9

commercializing, and growing this gaming and esports platform.

54. Between December 2021 and February 2022, Brag was able to attract some capital from outside investors.

55. In February 2022, Malloy and Leibovich caused Brag to file a confidential draft registration statement with the Securities and Exchange Commission ("SEC"), with the intent of taking Brag public.

56. Despite its best efforts, Brag was unable to attract sufficient outside investors to accomplish an IPO in 2022 or the first half of 2023.

57. Brag was unable to attract IPO investors, given that the Company's business model had not demonstrated any ability to generate meaningful revenue and the Company had sustained millions of dollars in operational losses.

## II.    Brag and Kingswood Solicit Plaintiffs to Invest in Brag's IPO

48.    Beginning in the fall of 2023, Brag made another push to launch an IPO.

49.    In October 2023, Malloy and Leibovich caused Brag to file a revised confidential draft registration statement with the SEC.

50.    Beginning around November 2023, Brag began its efforts to persuade Plaintiffs' Intermediary—an international investment firm with valuable relationships and contacts in the Asian high net worth investor community—either to invest directly in Brag's IPO or introduce Brag to high het worth individuals who would be interested in investing in Brag's IPO.

51.    Malloy was introduced to executives of Plaintiffs' Intermediary (the identities of whom are known to Defendants) through Evan Greenberg, the President of Legend Capital Management, which was acting as Brag's broker at that time.

52.    In a November 28, 2023 email introducing Malloy to those executives, Greenberg described himself as "a longtime friend and associate of [the Kingswood Executive]."  Greenberg wrote in the email that "[the executives] ha[ve] investors for The Brag House."

53.    Malloy advised the Plaintiffs' Intermediary's executives that Kingswood would be serving as the lead underwriter and sole bookrunning agent for the Brag IPO.  The Kingswood

Executive, who was based in Kingswood's midtown Manhattan office, was the Kingswood partner in charge of the underwriting. From late November 2023 through early February 2025, the Kingswood Executive, acting for Kingswood, routinely participated in discussions with Plaintiffs' Intermediary's executives. The Kingswood Executive knew these discussions were for the purpose of soliciting the potential investors on whose behalf Plaintiffs' Intermediary was acting. On information and belief, the Kingswood Executive resigned from Kingswood on or about February 4, 2025. The Kingswood Executive continued to work on the Brag IPO after his resignation from Kingswood, and Kingswood continued to be publicly identified by Brag as the lead underwriter and solebooking running agent for the IPO.

54.    On December 28, 2023, Greenberg sent the Plaintiffs' Intermediary's executives a "Kingswood Proposed IPO Timeline" that proposed "a closing in June [2024]."

55.    On December 29, 2023, Malloy sent the Plaintiffs' Intermediary executives a "Summary of [Brag's] Business and a Proforma." Malloy knew that those executives would be passing those materials, as well as any other company-related information that Malloy provided, to any high net worth investors for whom the executives were acting as intermediary. Malloy knew these high net worth investors included Plaintiffs.

56.    In early January 2024, Malloy and Leibovich caused Brag to file a revised confidential draft registration statement with the SEC. This draft registration statement listed Kingswood as "representative of the underwriters." This was the first time Brag's draft registration statement listed Kingswood as an underwriter.

57.    In late January 2024, Malloy and Leibovich caused Brag to file yet another revised confidential draft registration statement with the SEC. This draft registration statement listed Kingswood as "representative of the underwriters."

58.    On June 18, 2024, Brag filed a final registration statement with the SEC. Kingswood was against listed as the lead underwriter. The registration statement stated that the company would be offering 1,600,000 shares of common stock at an expected offering price of $5.00 per share.

59.     On July 10, 2024, Brag filed an amended final registration statement that responded to comments that the SEC issued to the June 18, 2024 final registration statement.  The July 10, 2024 filing again listed Kingswood as the lead underwriter.  Brag also filed a free writing prospectus on that same date.

60.     On August 5, 2024, Brag filed another amended final registration statement, increasing the number of registered IPO shares from 1,600,000 to 1,750,000.  The filing again listed Kingswood as the lead underwriter.  Brag also filed another free writing prospectus on that same date.

61.     According to its August 5, 2024 registration statement, the Company had generated approximately $600,000 in revenue over its first two years in existence.  The Company's total expenses during that same time period, was approximately $8.5 million.  The Company's registration statement also indicated that revenue growth may have stalled out; the Company's revenue during the first three months of 2024 was essentially identical to the same three-month period from the prior year

62.     Beginning around October 2024, Plaintiffs' Intermediary began conducted due diligence on Brag in earnest, including through in-person meetings with Malloy, Leibovich, and the Kingswood Executive in Manhattan, New York during October 2024.  Malloy, Leibovich, and the Kingswood Executive knew that this due diligence was for the purpose of obtaining material information that Plaintiffs' Intermediary would convey to the potential IPO investors on whose behalf it was serving as intermediary.

63.     Malloy, Leibovich, and the Kingswood Executive knew and intended that Plaintiffs' Intermediary would be engaging with and acting as the intermediary for high net worth investors located in Asia regarding Brag's IPO.  Malloy, Leibovich, and the Kingswood Executive hoped that the information that they provided to Plaintiffs' Intermediary, which they knew Plaintiffs' Intermediary would then be conveying to those high net worth potential investors, would help persuade those high net worth potential investors to invest in Brag's IPO.

64.     In the days following Brag's execution of the Agreement, Malloy, Leibovich, and

the Kingswood Executive continued to provide Plaintiffs' Intermediary information regarding Brag's business and finances, which Malloy, Leibovich, and the Kingswood Executive knew and expected Plaintiffs' Intermediary would provide to the high net worth individuals for whom it was acting as intermediary.

65.    On October 29, 2024, Malloy sent Plaintiffs' Intermediary a "draft S1" that Malloy said was "being audited by Marcum [LLP] and reviewed by the lawyers."  Malloy wrote that the document was being provided "for your eyes only in connection with your due diligence."

66.    This new "draft S1" modified the offering to 1,250,000 of common stock at an offering price of $4 per share.  The share count was later increased to 1,650,000 (exclusive of the underwriters' over-allotment) to satisfy the NASDAQ's mimimum offering size rules.

67.    On October 30, 2024, executives of Plaintiffs' Intermediary met with Malloy and the Kingswood Executive at Kingswood's office in midtown Manhattan to discuss the "draft S1" and the other information that Brag had provided to Plaintiffs' Intermediary.  Liebovich joined the meeting by teleconference.  The purpose of the meeting was for Mally and the Kingswood Executive to solicit the high net worth potential investors that Plaintiffs' Intermediary was syndicating.

68.    As Malloy, Leibovich, and the Kingswood Executive intended, Plaintiffs' Intermediary passed on to Plaintiffs—who ultimately purchased 50% of Brag's IPO shares (excluding whatever allotment the underwriters took)—the relevant business and financial information that Malloy, Leibovich, and the Kingswood Executive had provided to Plaintiffs' Intermediary.

**III.    Each Investor Plaintiff Agreed to Invest in Brag's IPO Only on the Material Condition That Brag Would Execute the Spinoff Transaction, Which Would Include the Pre-IPO Sharesholders Transferring Their Pre-IPO Shares to Plaintiffs in Exchange for Plaintiffs' Shares in the Spunoff Entity.**

69.    The relevant business and financial information—as provided by Malloy, Leibovich, and the Kingwood Executive—failed to convince any Investor Plaintiff that passively investing in Brag's IPO would be a wise decision. Plaintiffs' Intermediary's executives specifically conveyed this to Malloy, Leibovich, and the Kingswood Executive.

70.     However, on behalf of Plaintiffs, Plaintiffs' Intermediary proposed to Malloy, Leibovich, and the Kingswood Executive an alternative investment structure to which Plaintiffs would agree. This alternative structure (hereinafter the "spinoff/share transfer") is summarized as follows:

 a. Plaintiffs would, in the aggregate, be purchasing 50% of Brag's IPO shares at a price of $4 per share, which collectively would be an IPO investment of over $3 million. (Plaintiffs understood that there was a second group of investors, who were being solicited by a second underwriter involved in soliciting IPO investors, who intended to purchase the other 50% of the IPO shares if Plaintiffs went through with their IPO investments.)

 b. At some point shortly after the IPO (*i.e.*, within a few weeks of the IPO), all of Brag's pre-IPO assets and liabilities, as well as $2 million of the IPO proceeds, would be transferred to a newly created private company ("NewCo") that would subsequently be spun off from Brag.

 c. Brag would transfer some of the IPO proceeds to NewCo (to then deploy as NewCo deemed wise), but the lion's share of the IPO proceeds would remain in Brag's corporate account.

 d. Brag's pre-IPO shareholders would become the sole owners of NewCo, with the exactly the same ownership percentages in NewCo as they had in Brag prior to the IPO.

 e. Brag's pre-IPO shareholders then would transfer or cause to be transferred to Plaintiffs (or, alternatively, to cancel voluntarily) all of their pre-IPO shares in Brag, in exchange for Plaintiffs' shares in NewCo. This would leave Brag's IPO investors, including Plaintiffs, with full ownership and control of Brag (and would leave Plaintiffs with no ownership of NewCo).

71.     The net result of the spinoff/share transfer would be that:

 a. Plaintiffs would, in the aggregate, have substantial ownership of Brag,

which would be free of its pre-IPO liabilities and would have in its corporate bank account the lion's share of its IPO proceeds.  This would position the Company to retain new management, avoid wasting cash on Brag's failed pre-IPO business model, and capture future financing or business combination opportunities.

    b.    Brag's pre-IPO shareholders would fully own NewCo, which for the pre-IPO shareholders would be an improvement upon the pre-IPO version of Brag because it would keep some of the proceeds of the IPO, which otherwise would not occur.

72.    Plaintiffs, acting through Plaintiffs' Intermediary, proposed this spinoff/share transfer to Malloy, Leibovich, and the Kingswood Executive following a November 19, 2024 meeting involving Malloy, Leibovich, the Kingswood Executive and Plaintiffs' Intermediary's executives (the identities of whom are known to Defendants).  From that point forward, Malloy, Leibovich, and the Kingswood Executive knew and understood that any discussions they had with the Plaintiffs' Intermediary's executives regarding the spinoff/share transfer were tantamount to discussions with Plaintiffs for the purpose of offering or selling Brag's IPO shares to Plaintiffs.

73.    On December 19, 2024, the Plaintiffs' Intermediary's executives outlined the spinoff/share transfer in detail during a call with Brag's outside corporate counsel at the law firm Lucosky Brookman LLP.  On information and belief Lucosky Brookman then conveyed the proposal to Malloy, Leibovich, and the Kingswood Executive in conversations that would not be covered by the attorney-client privilege (both because they would not have conveyed attorney advice, but rather would simply have conveyed what the Plaintiffs' Intermediary's executives had conveyed during the December 19, 2024 meeting, and because Lucosky Brookman LLP's conversations with the Kingswood Executive were not attorney-client communications).

74.    Malloy, Leibovich, and the Kingswood Executive understood from Plaintiffs' Intermediary that Plaintiffs were not interested in investing in Brag's IPO other than as part of this spinoff/share transfer.

75.     On January 8, 2025, an executive of Plaintiffs' Intermediary sent a follow-up email to the Lucosky Brookman lawyers.  The executive wrote: "We are ready to move forward with Brag ASAP and would appreciate your guidance on the necessary steps and timelines for finalizing the sale of the company immediately following the IPO and subsequent establishment of a new Brag subsidiary that will either pursue its own IPO ASAP or spin off into a new listing and close another round of funding."

76.     Between January 8, 2025 and late February 2025, the Plaintiffs' Intermediary's executives had multiple additional conversations (some oral, some written) with Malloy, Leibovich, the Kingswood Executive, and the Lucosky Brookman lawyers regarding Plaintiffs' requirement that Brag agree to the spinoff/share transfer as a material condition of Plaintiffs purchasing Brag's IPO shares.

77.     Malloy, Leibovich, and the Kingswood Executive repeatedly assured the Plaintiffs' Intermediary's executives that Brag would agree to the spinoff/share transfer and, in addition, that they would ensure that all of Brag's pre-IPO shareholders would vote in favor of the spinoff/share transfer as necessary and cause the transfer of their pre-IPO shares to Plaintiffs as part of the spinoff /share transfer.  Malloy, Leibovich, and the Kingswood Executive knew that the Plaintiffs' Intermediary's executives would pass those assurance on to Plaintiffs, which the executives in fact did.

78.     On January 28, 2025, an executive of Plaintiffs' Intermediary sent the Kingswood Executive an email with the subject line "Outstanding Tasks For Brag IPO."  The executive wrote, "Please review the list of tasks and agreements below that must be completed to transfer funds and close the Brag IPO. Please discuss and confirm with [Lucosky Brookman] and Lavell in the morning. We need to get this done ASAP to transfer [Plaintiffs'] funds."  Among the tasks and agreements were (i) a "Side Agreement with [Malloy] . . . detailing the terms for the sale of [Brag] to [Plaintiffs] . . . shortly after the IPO, as advised by Company attorneys," and (ii) a "Share Transfer Agreement" under which Plaintiffs would "receive the remaining [Brag] shares (between 90% to 99% of the Company, TBD) for a nominal amount (TBD) at a later date, as advised by

Company attorneys." The executive also wrote that "all existing Company debt" would have to be "transferred to [NewCo]," which NewCo could pay using the "$2.0 million USD received from" the IPO investors (including Plaintiffs).

79. Malloy, Leibovich, and the Kingswood Executive informed the executive that they were in agreement with his January 28, 2025 email and would complete the outstanding tasks and agreements set forth therein.

80. Malloy, Leibovich, and Kingswood (acting through the Kingswood Executive) knew that Plaintiffs would not consummate the IPO transaction or provide Brag any IPO funding unless they received assurances that Brag and the pre-IPO shareholders would effectuate the spinoff/share transfer as promised shortly after the IPO. Malloy, Leibovich, and Kingswood (acting through the Kingswood Executive) had a direct financial stake in placating Plaintiffs and assuring them that those post-IPO transactions would proceed as promised.

81. On February 5, 2025, in advance of a phone call with Malloy to discuss the spinoff/share transfer, an executive of Plaintiffs' Intermediary wrote to Malloy that, in order for Plaintiffs to close on their IPO purchases, Brag needed to provide "actionable confirmations" that it in fact would follow through on its promises to effectuate the spinoff/share transfer soon after the IPO closed.

82. On a phone call the following day, Malloy confirmed to the executive that Brag understood and agreed to the spinoff/share transfer.

83. On February 10, 2025, the executive completed drafts of the requisite agreements that he had outlined in his January 28, 2025 email. The executive then provided those documents to Malloy, Leibovich, and the Kingswood Executive (who, on information and belief, apparently had resigned from Kingswood the prior week). The executive continued to discuss the agreements with Malloy, Leibovich, and the Kingswood Executive by phone and WhatsApp messages.

84. Malloy, Leibovich, and the Kingswood Executive understood that the representations they made to the Plaintiffs' Intermediary's executives regarding Brag's intention to effectuate the spinoff/share transfer after the IPO were (i) being conveyed to Plaintiffs, and

17

(ii) were material to Plaintiffs' decision whether to invest their money in Brag's IPO.

85.    On February 11, 2025, Brag filed another registration statement with the SEC. This registration statement again identified Kingswood as the lead underwriter.

86.    On February 12, 2025, an executive of Plaintiffs' Intermediary wrote to Malloy via WhatsApp regarding the spinoff/share transfer.  The executive wrote that "before any [investor] funds can move," Brag needed to "show the investor[s]"—that is, Plaintiffs—the various agreements to give the investors "comfort" that Brag "can deliver a clean vehicle . . . ." An executive of Plaintiffs' Intermediary wrote to Malloy later that day that Malloy needed to "demonstrate to [the Plaintiffs' Intermediary's executives] and the investor[s] ASAP that we have an achievable plan to deliver a clean vehicle before funds will move."  The executive also made clear to Malloy that Brag needed "[a]ll hands on deck to get the shareholders . . . signed off.  All very achievable, but we don't have a lot of time if we want to close by end of next week."

87.    The executive's reference to getting "the shareholders . . . signed off" was a reference to the fact that Brag's pre-IPO shareholders would need to consent to the spinoff/share transfer, as  the transaction (in order to work at all) would require the pre-IPO shareholders to conveying their shares in Brag to Plaintiffs in exchange for Plaintiffs' shares in NewCo.  The Plaintiffs' Intermediary's executive reminded Malloy in a February 12, 2025 WhatsApp message the importance of Brag having a "shareholder strategy."  The executive wrote:  "We can't have this blow up in our face after IPO."  He also wrote: "We just need to have a plan and convince the investor[s] they are protected ASAP before the funds are sent to close."

88.    On February 14, 2025, the SEC issued a notice of effectiveness with respect to the registration statement that Brag filed on February 11, 2025.  This was the first time that the SEC issued a notice of effectiveness with respect to any of Brag's registration statements.

89.    On February 17, 2025, Malloy and an executive of Plaintiffs' Intermediary exchanged numerous WhatsApp messages discussing the mechanics of obtaining consent from Brag's pre-IPO shareholders either to cancel their shares in Brag after the close of the IPO or to transfer their shares to the IPO investors who had been introduced to Brag and Kingswood by

Plaintiffs' Intermediary.  The executive wrote to Malloy that the investors were "ready to move funds this week" so long as Brag "got [the] docs finalized this week."  The executive also sent Malloy an "IPO & Post-IPO Flow Chart" that the executive had created on February 15, 2025, which made clear that the investors would be investing in Brag's IPO only on the material condition that Brag would, shortly after the IPO, consummate the spinoff/share transfer.

90.    In response to the executive's February 17, 2025 WhatsApp message, Malloy wrote: "Makes sense. Both [transfer and cancellation] work.  Transfer actually may be a bit easier but they definitely both work."  (The reference to "cancellation" was a reference to the fact that, an an alternative to the pre-IPO shareholders transferring their shares in Brag to Plaintiffs, the pre-IPO shareholders could simply cancel their shares in Brag.)  Malloy's response was a clear, unambiguous representation that, shortly the IPO, Brag would be executing the spinoff/share transfer that was a material condition of the investors' participation in Brag's IPO and that Malloy had confirmed the pre-IPO shareholders' agreement to the share transfer component of the transaction.

**IV.    Malloy Falsely Represents to Plaintiffs' Intermediary and Plaintiffs That He Had Obtained Executed Power of Attorney Forms From Brag's Non-Insider Pre-IPO Shareholders**

91.    Over the next several days, Malloy discussed with an executive of Plaintiffs' Intermediary the best mechanism for obtaining the pre-IPO shareholders' consent to transfer their Brag shares to Plaintiffs as part of the post-IPO spinoff/share transfer.  Malloy decided that he would have the pre-IPO shareholders execute "Limited Financial Power of Attorney" forms that would vest in Malloy's lawyer and confidante Scott Woller the power to execute share transfers. Malloy represented to the executive that Woller would exercise that power in whatever way Malloy instructed.

92.    Malloy advised an executive of Plaintiffs' Intermediary in a February 19, 2025 WhatsApp message that "Scott is ok with [the forms].  Let's name him [as the attorney each shareholder appoints to act on the shareholder's behalf with respect to any share transfers] and he is ready to start sending [the forms] out [to the pre-IPO shareholders]."

93.     On February 21, 2025, the executive of Plaintiffs' Intermediary told Malloy that he expected that "[t]he biggest challenge will be getting all of the shareholders to execute the Power of Attorney . . . ."

94.     On February 23, 2025, the executive again reiterated to Malloy that "[t]he biggest hurdle will be getting the shareholders to sign and notarize the Power of Attorney.  We need to get this done ASAP."  The executive expressed concern that, although Malloy had "said multiple times it was no issue getting the shareholders to sign a power [of] attorney before the IPO," Malloy had not yet provided Plaintiffs' Intermediary any executed power of attorney forms.  The executive bluntly wrote to Malloy that, without a clear indication that the pre-IPO shareholders would agree to transfer their shares as part of the spinoff/share transfer, Plaintiffs "will feel this is too risky and will not proceed."

95.     On February 27, 2025, Malloy still had not delivered any executed power of attorney forms to Plaintiffs' Intermediary.  Malloy expressed concern that if the IPO did not close soon, NASDAQ might close Brag's IPO window, which would cause the IPO to fail and likely result in the collapse of the Company.

96.     On the evening of February 27, 2025, Malloy began communicating with an executive of Plaintiffs' Intermediary on a WhatsApp thread that now included the Kingswood Executive.  In that thread, Malloy began making representations to the executive that he already had obtained signed power of attorney forms from pre-IPO shareholders who would hold a slight majority—roughly 52%—of Brag's shares after the close of the IPO.

97.     Malloy knew that it was critical to represent to the Plaintiffs' Intermediary's executives that at least a majority of the pre-IPO shareholders had appointed Woller as their attorney in fact with respect to the spinoff/share transfer decisions.  Malloy knew that the executives would convey that information to Plaintiffs, and Malloy hoped that the information would give Plaintiffs sufficient confidence to close the IPO and wire their funds to Kingswood (which Malloy also knew would cause the second group of IPO investors to wire *their* funds to Brag's other underwriter).

98.     Malloy urged the Plaintiffs' Intermediary's executives that having executed power of attorney forms from a majority of the Brag pre-IPO investors should be enough to convince Plaintiffs to consummate their IPO investments and wire their funds to Kingswood.  Malloy wrote that, "If the money" from Investors Plaintiffs was not sent to Kingswood that evening, "we are fucked."

99.     The shareholders from whom Malloy claimed he had received executed power of attorney forms included a private venture fund based in London that would hold slightly under 5% of Brag's shares after the closing of the IPO.

100.     On March 2, 2025, an executive of Plaintiffs' Intermediary asked Malloy via WhatsApp (on the thread that included the Kingswood Executive): "Lavell how are the POAs coming along? Almost done?"  Malloy responded: "Yessir. You will have them all by tomorrow as promised."

101.     Malloy also sought to soothe any concern that Brag would not fulfill its promise to consummate the spinoff/share transfer post-IPO.  Malloy wrote to an executive of Plaintiffs' Intermediary on March 3, 2025: "Obviously we are going to [follow through with the spinoff/share transfer ]. [Leibovich and I] are the one[s] signing the resolutions and we went out and had to speak to the [pre-IPO shareholders] to convince them to sign the POA.  If I was the [IPO] investor I would be ok considering I am the CEO and [Leibovich] is management and there are two securities lawyers managing the situation. . . . I have been saying the same thing for a week and came through on everything I said."  The executive responded: "Documentation is stronger than words!"  Malloy replied: "Scott now has the POAs for me and Malloy trust.  You now have all the ones in my control."

102.     On March 4, 2025, Malloy again pressed Plaintiffs' Intermediary that Brag needed Plaintiffs to wire their funds to Brag soon.  Malloy write, "[I]f we don't have all the money in by noon tomorrow, we are in trouble."  An executive of Plaintiffs' Intermediary responded that Plaintiffs still needed confirmation that Malloy had obtained the power of attorney forms from all the pre-IPO shareholders.

103.    Malloy was incredulous that the executive did not trust him.  Malloy wrote: "lol maybe one day you will trust me."  The executive responded: "Its [sic] the people you do not know who are trusting us with $6.785m! They just want to be comfortable."  (The executive's reference to $6.785m was a reference to the fact that, if Plaintiffs went through with the IPO, the executive understood that the second group of IPO investors would as well.)

104.    At 7:54 pm. on March 4, 2025, Malloy wrote to the Plaintiffs' Intermediary's executive on that same WhatsApp thread that he had "confirmed Scott [Waller] has Assim Kahn's [executed power of attorney] – we are well over 51 percent . . . ."  The executive responded: "Yes!!! 54.50%"

105.    Throughout that evening, Malloy continued to represent to the executive that additional executed power of attorney forms had been obtained.  Malloy assured the executive that none of the pre-IPO shareholders would "need to be managed."  The executive responded: "I[n] that case, we should be able to get 100%."  Malloy replied: "If you do it like I told you and you let me handle it I can do it, I've always got a 100 percent . . . . We have control of the deal. The [IPO investors] can feel confident now."

106.    On March 5, 2025, based on Malloy's (i) representations that he had obtained executed power of attorney forms from all of the pre-IPO shareholders, (ii) assurance that Woller would, pursuant to those power of attorney forms, exercise his authority to transfer the pre-IPO shareholders' shares to Plaintiffs, and (iii) promises that Brag would execute the spinoff/share transfer and Woller would execute the share transfers shortly after the IPO closed, Plaintiffs closed on their IPO purchases and cause more than $3 million to be wired to Kingswood.

107.    On information and belief, the second group of IPO investors closed on their IPO purchases, and wired their IPO purchase money to Brag's second underwriter, shortly thereafter.

108.    Brag's shares began trading on the NASDAQ the next day, March 6, 2025.

**V.    Malloy "Withdraws" the Pre-IPO Shareholders' Supposedly Executed Power of Attorney Forms and Reneges on Brag's Promise to Effectuate the Spinoff/Share Transfer**

109.    Brag's IPO closed on March 5, 2025, and its shares began trading on the NASDAQ

on March 6, 2025.  Ten days later, Malloy still had not taken steps to put the promised spinoff/share transfer and pre-IPO shareholders' share transfer into motion.  An executive of Plaintiffs' Intermediary expressed concern about Malloy's delays.  In a WhatsApp message to Woller and the Kingswood Executive (who by that time had resigned from Kingswood), the executive wrote: "[Malloy's] actions suggest either profound incompetence or deliberrate manipulation . . . . There is no legal justification for his inaction.  Please remind him that this is not his company.  He agreed to sell it and is now going back on his commitments and his failure to act looks like outright theft.  He stole [Plaintiffs'] money and is delaying delivering the vehicle.  Trust me, he is setting up the board to reject the [spinoff/share transfer and pre-IPO share transfers] plan. . . . [Malloy] made explicit promises . . . . He said he would never in a million years screw us, yet here we are."

110.    The Kingswood Executive understood the urgency of the executive's message.  He responded: "I have reached out to [Malloy]/his daughter's bday is today so I haven't gotten him yet."

111.    On March 20, 2025, Woller wrote to the executive: "I just received a written notice from [Malloy] withdrawing the POAs.  According to [the Kingswood Executive], [Malloy] was aware he could revoke them.  I did not say anything to him.  This came out of nowhere."  The executive responded: "Well, isn't that interesting! He has made his intention crystal clear now.  He just cooked himself."

112.    Malloy, however, then continued to lull Plaintiffs, through communications to Plaintiffs' Intermediary, into believing that the spinoff/share transfer would be effectuated soon.

113.    Over the next ten days, Plaintiffs, through Plaintiffs' Intermediary, sought an explanation from Malloy regarding the withdrawal of the powers-of-attorney and confirmation that the spinoff/share transfer that they had been promised as a material condition of their IPO investments would in fact take place.

114.    On the morning of April 1, 2025, without any notice to Plaintiffs, Brag filed with the SEC an 8-k announcing that the company would be unable to meet its 10-k reporting deadline.

The price of Brag's shares plummeted 80% on this announcement in a waterfall decline. This caused Plaintiffs to sustain substantial paper losses on their shares.

115. Brag never executed the spinoff/share transfer that was a material condition of Plaintiffs' investments in Brag's IPO. Nor did any of Brag's pre-IPO shareholders cancel their Brag shares or transfer their Brag shares to Plaintiffs, as Malloy promised would occur as part of the aforementioned spinoff/share transfer.

116. On August 11, 2025, Brag filed a registration statement with the SEC announcing a secondary transaction in which the company would be selling (i) 15,000 shares of preferred common stock, with each share convertible into ~1,062 shares of common stock at an exercise price of ~94 cents per share, and (ii) PIPE warrants, with an exercise period of five years, allowing the warrant holders to purchase up to an aggregate of 15,923,567 shares of common stock at an exercise price of ~82 cents per share. This secondary transaction massively diluted Plaintiffs' Brag shares, caused Brag's share price to further decline, and, importantly, made it impossible for Brag to execute the spinoff/share transfer that Brag, Malloy, Leibovich, and Kingswood had promised to Plaintiffs to induce their IPO investments.

117. After learning that the representations they had relied upon in deciding to invest in Brag's IPO were not true, and to minimize their economic losses, Plaintiffs sold their Brag IPO shares on the NASDAQ for less than the purchase price.

**VI. Plaintiffs Learn That Malloy Made False Representations About the Pre-IPO Shareholders' Supposedly Executed Power of Attorney Forms**

118. Shortly after Brag's August 11, 2025 announcement of the secondary stock and warrant sale that massively diluted Plaintiffs' shares, Plaintiffs (through their counsel) learned that the supposedly executed and valid power of attorney forms that Malloy had presented to Plaintiffs' Intermediary to induce Plaintiffs' IPO investments were false and misleading. Specifically, the sole members and managers of the London-based private venture fund referenced above confirmed to Plaintiffs' counsel that they had not executed, nor authorized the execution of, nor been *asked* to execute any power of attorney form giving Woller (or anyone else) authority over the venture fund's pre- or post-IPO shares in Brag. This was a shocking

revelation, because it was unequivocal proof that Malloy had made brazenly fraudulent statements to Plaintiffs' Intermediary (knowing that those statements would be passed on to, and relied on by, Plaintiffs) to induce Plaintiffs' IPO purchases.

119.    On information and belief, the London-based venture fund's purported power of attorney form is not the only non-insider pre-IPO shareholder power of attorney form that Malloy falsely represented had been validly executed.  On information and belief, the only pre-IPO shareholder power of attorney forms that had been validly executed were the forms for the Malloy Family Trust and the Leibovich Family Trust.

120.    Moreover, regardless of whether any of the power of attorney forms had been executed by the pre-IPO shareholder identified on the power of attorney form, those power of attorney forms were false and fraudulent because Malloy and Leibovich intended to revoke or cause the revocation of those powers of attorney immediately after the IPO and, in addition, did not intend to instruct or permit Woller to transfer any pre-IPO shares to Plaintiffs.

121.    Had Plaintiffs known that (i) Malloy had not obtained valid, legitimate power of attorney forms from Brag's pre-IPO shareholders, (ii) Malloy had presented Plaintiffs' Intermediary with false and invalid power of attorney forms, and (iii) the promised spinoff/share transfer transaction would never be consummated, Plaintiffs would not have agreed to purchase Brag's IPO shares and would not have authorized the wiring of their funds to Kingswood.

122.    That Malloy fabricated the power of attorney forms is clear proof that the promises of the spinoff/share transfer plan had been false and fraudulent representations of Brag's, Malloy's, Leibovich's, the Malloy Family Trust's, and the Leibovich Family Trust's intentions regaring the spinoff/share transfer plan that Malloy, Leibovich, and Brag used to induce Plaintiffs' IPO investments.

## VII.    Loss Causation

123.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs.

124.    Plaintiffs purchased the subject securities at artificially inflated prices and were

damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**SECURITIES ACT OF 1933 AND STATE CAUSES OF ACTION THAT ARE BASED ON NEGLIGENCE OR STRICT LIABILITY OR THAT OTHERWISE DO *NOT* REQUIRE A SHOWING OF FRAUD**

125.    As stated above, Plaintiffs raise these claims that are not based on fraud, recklessness, or intentional misconduct. Rather, the claims are based on negligence or strict liability under the Securities Act or other applicable law, and no showing of fraud or culpable intent is required or alleged. In these non-fraud-based causes of action, Plaintiffs disclaim—and do not intentionally rely on—any allegation of fraud, recklessness, or intentional misconduct.

126.    For the purposes of these causes of action, Plaintiffs exclude and do not incorporate ¶¶ 5, 11, 12(d), 118, 120, and 122.

127.    To the extent Plaintiffs have raised allegations or causes of action involving fraud, recklessness, or intentional misconduct, those allegations and claims are raised in the alternative to the allegations and claims under Counts One, Two, Three, Four, Five, Six, and Seven.

**COUNT ONE**
**Section 12(a)(2) of the Securities Act (15 U.S.C. § 77l)**
**(Defendants Brag, Malloy, Leibovich, and Kingswood)**

128.    Plaintiffs reallege and incorporate by reference ¶¶ 1 – 127 above, excluding ¶¶ 5, 11, 12(d), 118, 120, and 122, as well as any other allegation if construed as sounding in fraud.

129.    Brag's IPO shares were securities that were not exempt under 15 U.S.C. § 77c(2) or (14).

130.    Brag was the issuer of the IPO shares.

131.    Each of the Count One defendants was, with respect to Brag's IPO shares, a person who offered or sold the Brag IPO shares to Plaintiffs.

132.    Each of the Count One defendants offered or sold the Brag IPO shares to Plaintiffs both by means of prospectuses and oral statements in relation to a prospectus. Those prospectuses and oral statements were transmitted through and in relation to interstate commerce.

133.    The prospectuses by which the Count One defendants offered or sold the Brag IPO shares to Plaintiffs included the emails and WhatsApp messages that the defendants sent to the Plaintiffs' Intermediary's executives regarding Brag's commitment to the post-IPO spinoff  that would leave Brag as a debt-free, publicly-traded entity in which Plaintiffs would have a substantial control position and that, in addition to operating under new management, could be positioned for future financing and business combination opportunities.  Those emails and WhatsApp messages were an integral part of the "roadshow" communications that Brag, Malloy, Leibovich, and Kingswood (acting through the Kingswood Executive through at least February 4, 2025) made to Plaintiffs (by means of Plaintiffs' Intermediary) to solicit their Plaintiffs' IPO purchases.  Those emails and WhatsApp messages expressly promised, and were expressly intended to assure Plaintiffs, that Brag would engage and cause its pre-IPO shareholders to engage in a specific corporate transaction (i.e., the spinoff/share transfer) essentially immediately after the close of the IPO, specifically to induce Plaintiffs' IPO investments.  Brag, Malloy, Leibovich, and Kingswood represented the spinoff/share transfer as consistent with the written prospectus that Brag had filed with the SEC.  Brag, Malloy, Leibovich, and Kingswood also knew at the time they were making their representations that Plaintiffs were the only prospective investors who had any serious interest in investing in Brag's IPO (and later knew that the second group of IPO investors would not invest in the IPO unless Plaintiffs did as well) .

134.    The oral statements by which the Count One defendants offered or sold the Brag IPO shares included the oral statements regarding Brag's commitment to the post-IPO spinoff/share transfer that they made to the Plaintiffs' Intermediary's executives during telephone calls, video conferences, and in-person meetings that they conducted for the purpose of soliciting Plaintiffs' investment in the IPO.  These oral statements were in relation to a prospectus because they modified and amplified the statements made in Brag's prospectuses regarding Brag's business plan and intended use of IPO proceeds.

135.    The Count One defendants' representations about Brag's commitment to effectuate the post-IPO spinoff/share transfer  were untrue, false, and misleading because

(i) Malloy and Leibovich did not intend to present the spinoff/share transfer to Brag's Board of Directors; (ii) Malloy and Leibovich did not intend to support the spinoff/share transfer if the transaction were presented to the Board of Directors; (iii) Malloy and Leibovich did not intend to cause Brag to effectuate the spinoff/share transfer; (iv) Malloy had not obtained validly executed power of attorney forms from Brag's pre-IPO shareholders; and (v) the pre-IPO shareholders had not agreed to transfer their pre-IPO shares to Plaintiffs in connection with a spinoff/share transfer transaction. Thus, the Count One defendants' statements were not forward-looking statements about events that did not come to fruition, but untrue representations about their present intentions.

136. The Count One defendants' untrue statements regarding the spinoff/share transfer were in connection to the offer and sale of Brag's IPO shares to Plaintiffs.

137. Plaintiffs sustained substantial economic losses as a result of the Count One defendants' conduct, as they sold their Brag IPO shares on the NASDAQ for less than the purchase price after learning that the defendants' representations on which they had relied were not true.

138. The Count One defendants are liable for all of Plaintiffs' losses because those losses are equal to the difference in the value of Plaintiffs' Brag shares at the time they were sold and the value that those shares would have had if the promised spinoff/share transfer had been effectuated (or, alternatively, the difference in what Plaintiffs purchased the IPO shares for and what they sold them for after learning that the representations that had induced them to purchase the IPO shares were untrue).

**COUNT TWO**
**Section 15 of the Securities Act (15 U.S.C. § 77o)**
**(Defendants Malloy and Leibovich)**

139. Plaintiffs reallege and incorporate by reference all of the allegations in ¶¶ 1 – 138 above, excluding ¶¶ 5, 11, 12(d), 118, 120, and 122, as well as any other allegation if construed as sounding in fraud.

140. Malloy and Leibovich are and at all relevant times were control persons of Brag

and, with respect to the underwriting of Brag's IPO, Kingswood.

141.     Malloy and Leibovich are liable for all of Plaintiffs' losses.

**COUNT THREE**
**Unjust Enrichement**
**(Defendant Brag)**

142.     Plaintiffs reallege and incorporate by reference all of the allegations in ¶¶ 1 – 141 above.

143.     Plaintiffs enriched Brag by the amount of money that the Investor Plaintiff invested in Brag's IPO.

144.     In return for Plaintiffs' IPO funds, Brag failed to provide to Plaintiffs shares that were equivalent in value to what Plaintiffs invested.

145.     In return for Plaintiffs' IPO funds, Brag failed to provide to Plaintiffs what Brag, through its control persons Malloy and Leibovich, had promised to provide to Plaintiffs—namely, a spinoff/share transfer that would result in Plaintiffs having a substantial control position in Brag, which would be free of its pre-IPO liabilities and no commitment to Brag's failed pre-IPO business model, would have the majority of the IPO proceeds in its corporate bank account, and would be ideally positioned for future financing and/or business combination opportunities with new management at the helm.

146.     Brag was unjustly enriched by the IPO proceeds that it received from Plaintiffs. Plaintiffs plead this Count Three in the alternative to any other counts deemed inconsistent with Count Three.

**COUNT FOUR**
**Delaware Securities Act (§ 73-605(a)(2))**
**(Defendants Brag, Malloy, Leibovich, and Kingswood)**

147.     Plaintiffs reallege and incorporate by reference ¶¶ 1 – 146 above, excluding ¶¶ 5, 11, 12(d), 118, 120, and 122, as well as any other allegation if construed as sounding in fraud.

148.     Brag's IPO shares were securities.

149.     Brag was the issuer of the IPO shares.

150.     Each of the Count Four defendants was, with respect to Brag's IPO shares, a

person who offered or sold the Brag IPO shares to Plaintiffs.

151.    Each of the Count Four defendants offered or sold the Brag IPO shares to Plaintiffs both by means of prospectuses and oral statements in relation to a prospectus. Those prospectuses and oral statements were transmitted through and in relation to interstate commerce.

152.    The prospectuses by which the Count Four defendants offered or sold the Brag IPO shares to Plaintiffs included the emails and WhatsApp messages that the defendants sent to the Plaintiffs' Intermediary's executives regarding Brag's commitment to the post-IPO spinoff/share transfer that would leave Brag as a debt-free, publicly-entity entity in which Plaintiffs would have a substantial control position and that would be ideally positioned for future financing and business combination opportunities under new management. Those emails and WhatsApp messages were an integral part of the "roadshow" communications that Brag, Malloy, Leibovich, and Kingswood (through the Kingswood Executive) made to Plaintiffs (by means of Plaintiffs' Intermediary) to solicit their IPO purchases. Those emails and WhatsApp messages expressly promised, and were expressly intended to assure Plaintiffs, that Brag would engage and cause its pre-IPO shareholders to engage in a specific corporate transaction (i.e., the spinoff/share transfer) essentially immediately after the close of the IPO, specifically to induce Plaintiffs' IPO investments. Brag, Malloy, Leibovich, and Kingswood represented the spinoff/share transfer as consistent with the written prospectus that Brag had filed with the SEC, and they knew at the time they were making their representations that Plaintiffs were the only investors who had any serious interest in investing in Brag's IPO (and, later, that the second group of IPO investors would invest only if Plaintiffs did so as well).

153.    The oral statements by which the Count Four defendants offered or sold the Brag IPO shares included the oral statements regarding Brag's commitment to the post-IPO spinoff/share transfer that they made to the Plaintiffs' Intermediary's executives during telephone calls, video conferences, and in-person meetings that they conducted for the purpose of soliciting Plaintiffs' investment in the IPO. These oral statements were in relation to a prospectus because they modified and amplified the statements made in Brag's prospectuses regarding Brag's

business plan and intended use of IPO proceeds.

154.   The Count Four defendants knew that the effectuation of the spinoff/share transfer shortly after the IPO was material to Plaintiffs' decision to invest more than $3 million in Brag's IPO.

155.   The Count Four defendants therefore knew that their promises and representations that Brag would effectuate the spinoff/share transfer  shortly after the close of the IPO would be material to Plaintiffs' investment decisions.

156.   The Count Four defendants' representations about Brag's commitment to effectuate the post-IPO spinoff/share transfer were untrue, false, and misleading because because (i) Malloy and Leibovich did not intend to present the spinoff/share transfer to Brag's Board of Directors; (ii) Malloy and Leibovich did not intend to support the spinoff/share transfer if the transaction were presented to the Board of Directors; (iii) Malloy and Leibovich did not intend to cause Brag to effectuate the spinoff/share transfer; (iv) Malloy had not obtained validly executed power of attorney forms from Brag's pre-IPO shareholders; and (v) the pre-IPO shareholders had not agreed to transfer their pre-IPO shares to Plaintiffs in connection with a spinoff/share transfer transaction.  Thus, the Count Four defendants' statements were not forward-looking statements about events that did not come to fruition, but untrue representations about their present intentions.

157.   The Count Four defendants' untrue, false, or misleading statements regarding the spinoff/share transfer were in connection to the offer and sale of Brag's IPO shares to Plaintiffs.

158.   Plaintiffs sustained substantial economic losses as a result of the Count Four defendants' conduct, as they sold their Brag IPO shares for less than the purchase price after learning that the defendants' representations on which they had relied were untrue.

159.   The Count Four defendants are liable for all of Plaintiffs' losses because those losses are equal to the difference in the value of Plaintiffs' Brag shares at the time they were sold and the value that those shares would have had if the promised spinoff/share transfer had been effectuated (or, alternativey, the difference between what the Plaintiffs purchased the IPO shares

for and what they sold those shares for on the NASDAQ after learning that the representations that the Count Four defendants used to induce their IPO purchases were untrue).

## SECURITIES EXCHANGE ACT OF 1934 AND STATE CAUSES OF ACTION BASED AND SOUNDING IN FRAUD

160.    As stated above, Plaintiffs raise these claims in the alternative to the claims that are not based on fraud, recklessness, or intentional misconduct. Plaintiffs do <u>not</u> incorporate allegations of fraud, recklessness, or intentional misconduct into Counts One through Four above.

**COUNT FIVE**
**Section 10(b) of the Exchange Act (15 U.S.C. § 78j)**
**(Defendants Brag, Malloy, Malloy Family Trust, Leibovich, and Leibovich Family Trust)**

161.    Plaintiffs reallege and incorporate by reference all of the allegations in ¶¶ 1 – 160 above, including all allegations sounding in fraud.

162.    Brag's IPO shares were securities that were registered on a national exchange.

163.    In connection with, and to induce, the sale of Brag's IPO shares to Plaintiffs, the Count Five defendants made materially untrue, false, and misleading statements, both in writing and orally.

164.    The Count Five defendants' materially untrue, false, and misleading representations included (i) their representations that they supported the spinoff/share transfer that they knew was a material condition of Plaintiffs' investment in Brag's IPO, (ii) their representations that they would obtain the approval of the Board of Directors to effectuate the spinoff/share transfer and the consent of Brag's pre-IPO shareholders to transfer their pre-IPO shares to Plaintiffs, (iii) their representations that Malloy had obtained validly executed power of attorney forms from Brag's non-insider pre-IPO shareholders that would allow Malloy to transfer those shareholders' shares to Plaintiffs, and (iv) their representations that the Malloy Family Trust and Leibovich Family Trust (which Malloy and Leibovich, respectively, solely controlled) would transfer or cause Woller to tranfer the Trusts' pre-IPO shares to Plaintiffs.

165.    In truth and in fact, Brag, Malloy, and Leibovich never intended to effectuate the spinoff/share transfer or share transfer plan; the non-insider pre-IPO shareholders' executed power of attorney forms that Malloy claimed he had obtained in fact were false, fraudulent, and

invalid; and neither Malloy nor Leibovich ever intended to cause the Malloy Family Trust or Leibovich Family Trust to transfer their pre-IPO shares to Plaintiffs or to support in any way the spinoff/share transfer that Malloy and Leibovich had promised.  Thus, the Count Five defendants' statements were not forward-looking statements about events that did not come to fruition, but false and misleading representations about their present intentions.

166.    The Count Five defendants knew or were reckless in not knowing that those aforementioned representations were materially untrue, false, and misleading.

167.    The Count Five defendants' materially untrue, false, and misleading statements induced Plaintiffs to invest more than $3 million in Brag's IPO.

168.    Plaintiffs sustained substantial economic losses as a result of the Count Five defendants' conduct, as they sold their Brag IPO shares for less than the purchase price after learning that the defendants' representations on which they had relied were false and fraudulent.

169.    The Count Five defendants are liable for all of Plaintiffs' losses because those losses are equal to the difference in the value of Plaintiffs' Brag shares at the time they were sold and the value that those shares would have had if the promised spinoff/share transfer had been effectuated (or, alternatively, the difference between what the Plaintiffs purchased the IPO shares for and what they sold them for on the NASDAQ after learning that the representations that had been used to induce their IPO purchases were false, misleading, untrue, and fraudulent).

**COUNT SIX**
**Section 20 of the Exchange Act (15 U.S.C. § 78t)**
**(Defendants Malloy and Leibovich)**

170.    Plaintiffs reallege and incorporate by reference all of the allegations in ¶¶ 1 – 169 above, including all allegations sounding in fraud.

171.    Malloy and Leibovich are and at all relevant times were control persons of Brag, the Malloy Family Trust, and the Leibovich Family Trust.

172.    Malloy and Brag knew or had reason to know that Brag's representations to Plaintiffs regarding the spinoff/share transfer  that was a material condition of Plaintiffs' decision to invest in Brag's IPO was material untrue, false, or misleading.  They also knew or had reason

to know that the representations of the Malloy Family Trust and Leibovich Family Trust that they would cause Woller to transfer the Trusts' pre-IPO shares to Plaintiffs were untrue, in the Trusts intended to revoke immediately following the IPO the powers-of-attorney that they had granted to Woller and not to transfer their pre-IPO shares.

173.    Malloy and Leibovich did not act in good faith, and they directly or indirectly induced Brag's violations of Section 10(b) of the Exchange Act.

### COUNT SEVEN
### Common Law Fraud
**(Defendants Brag, Malloy, Malloy Family Trust, Leibovich, and Leibovich Family Trust)**

174.    Plaintiffs reallege and incorporate by reference all of the allegations in ¶¶ 1 – 173 above, including all allegations sounding in fraud.

175.    In connection with, and to induce, the sale of Brag's IPO shares to Plaintiffs, the Count Seven defendants made materially untrue, false, and misleading statements, both in writing and orally.

176.    The Count Seven defendants' materially untrue, false, and misleading representations included (i) their representations that they supported the spinoff/share transfer that they knew was a material condition of Plaintiffs' investment in Brag's IPO, (ii) their representations that they would obtain the approval of the Board of Directors to effectuate the spinoff transaction and the consent of Brag's pre-IPO shareholders to transfer their pre-IPO shares to Plaintiffs, (iii) their representations that Malloy had obtained validly executed power of attorney forms from Brag's non-insider pre-IPO shareholders that would allow Malloy to transfer those shareholders' shares to Plaintiffs, and (iv) their representations that the Malloy Family Trust and Leibovich Family Trust would transfer or cause Woller to transfer all of the Trusts' pre-IPO shares to Plaintiffs as part of the spinoff/share transfer that Brag, Malloy, Leibovich, and Kingswood promised Brag would effectuate immediately following the IPO.

177.    Plaintiffs reasonably relied on all of the above untrue, false, and misleading statements in deciding to purchase Brag's IPO shares.

178.    In truth and in fact, Brag, Malloy, and Leibovich never intended to effectuate the

spinoff/share transfer or share transfer plan; the non-insider pre-IPO shareholders' executed power of attorney forms that Malloy claimed he had obtained in fact were false, fraudulent, and invalid; and neither Malloy nor Leibovich ever intended to cause the Malloy Family Trust or Leibovich Family Trust to transfer their pre-IPO shares to Plaintiffs.

179.    The Count Seven defendants knew or were reckless in not knowing that those aforementioned representations were materially untrue, false, and misleading.

180.    The Count Seven defendants' materially untrue, false, and misleading statements induced Plaintiffs to invest more than $3 million in Brag's IPO.

181.    Plaintiffs sustained substantial economic losses as a result of the Count Seven defendants' conduct, as they sold their Brag IPO shares for less than the purchase price after learning that the defendants' representations on which they had relied were false and fraudulent.

182.    The Count Seven defendants are liable for all of Plaintiffs' losses because those losses are equal to the difference in the value of Plaintiffs' Brag shares at the time they were sold and the value that those shares would have had if the promised spinoff/share transfer had been effectuated (or, alternatively, the difference between what Plaintiffs purchase the IPO shares for and what they sold the shares for on the NASDAQ after learning that the statements that were used to induce their IPO purchases were false, misleading, untrue, and fraudulent).

## COUNT EIGHT
### Delaware Securities Act, § 73-201
### (Defendants Brag, Malloy, Leibovich, and Kingswood)

183.    Plaintiffs reallege and incorporate by reference all of the allegations in ¶¶ 1 – 182 above.

184.    The Brag IPO shares were securities.

185.    Each of the Count Eight defendants sold or offered the Brag IPO securities to Plaintiffs.

186.    In connection with, and to induce, the sale of Brag's IPO shares to Plaintiffs, the Count Eight defendants made materially untrue, false, and misleading statements, both in writing and orally.

187.    The Count Eight defendants' materially untrue, false, and misleading representations included (i) their representations that they supported the spinoff/share transfer that they knew was a material condition of Plaintiffs' investment in Brag's IPO, (ii) their representations that they would obtain the approval of the Board of Directors to effectuate the spinoff transaction and the consent of Brag's pre-IPO shareholders to transfer their pre-IPO shares to Plaintiffs, (iii) their representations that Malloy had obtained validly executed power of attorney forms from Brag's non-insider pre-IPO shareholders that would allow Malloy to transfer those shareholders' shares to Plaintiffs, and (iv) their representations that the Malloy Family Trust and Leibovich Family Trust would transfer or cause to be transferred their pre-IPO shares to Plaintiffs as part of the spinoff/share transfer that Brag, Malloy, Leibovich, and Kingswood had promised to Plaintiffs to induce their IPO investments.

188.    Plaintiffs reasonably relied on all of the above untrue, false, and misleading statements in deciding to purchase Brag's IPO shares.

189.    In truth and in fact, Brag, Malloy, and Leibovich (i) never intended to effectuate the spinoff transaction; (ii) knew the non-insider pre-IPO shareholders' executed power of attorney forms that Malloy claimed he had obtained in fact were false, fraudulent, and invalid; (iii) knew the pre-IPO shareholders had never expressed an intent or willingness to transfer their pre-IPO shares to the IPO investors; and (iv) neither Malloy nor Leibovich ever intended to cause the Malloy Family Trust or Leibovich Family Trust to transfer of their pre-IPO shares to Plaintiffs.

190.    The Count Eight defendants knew or were reckless in not knowing that those aforementioned representations were materially untrue, false, and misleading.

191.    The Count Eight defendants' materially untrue, false, and misleading statements induced Plaintiffs to invest more than $3 million in Brag's IPO.

192.    Plaintiffs sustained substantial economic losses as a result of the Count Eight defendants' conduct, as they sold their Brag IPO shares for less than the purchase price after learning that the defendants' representations on which they had relied were false and fraudulent.

193.    The Count Eight defendants are liable for all of Plaintiffs' losses because those

losses are equal to the difference in the value of Plaintiffs' Brag shares at the time they were sold and the value that those shares would have had if the promised spinoff/share transfer had been effectuated (or, alternatively, the difference between what Plaintiffs purchase the IPO shares for and what they sold the shares for on the NASDAQ after learning that the statements that were used to induce their IPO purchases were false, misleading, untrue, and fraudulent).

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs pray for the following relief:

a. Money damages equal to the economic losses that Plaintiffs sustained because of Defendants' violations of federal and state securities laws and common law.

b. Recission to the extent available.

c. Punitive damages.

d. Attorneys' fees and costs.

e. Pre- and post-judgment interest.

f. Any other relief that the Court deems just and proper.

Dated: March 5, 2026                          Respectfully Submitted,

*/s/ Aaron M. Katz*
Aaron M. Katz (pro hac vice forthcoming)
Aaron Katz Law LLC
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305
akatz@aaronkatzlaw.com

*/s/ Constantine Economides*
Constantine Economides
Eric Rosen (pro hav vice forthcoming)
Dynamis LLP
175 Federal Street, Suite 1200
Boston, MA 02110
(617) 802-9157
ceconomides@dynamisllp.com
erosen@dynamisllp.com