UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X

DEKUI ET AL.,

Plaintiffs,

-v-

BRAG HOUSE HOLDINGS INC., et al,

Defendants.

---------------------------------------- X

26cv1840 (DLC)

OPINION AND ORDER

APPEARANCES:

For plaintiffs:

Constantine P. Economides
Dynamis LLP
233 Broadway, Suite 1750
New York, NY 10279

Aaron M. Katz
Aaron Katz Law LLC
399 Boylston Street, 6th Floor
Boston, MA 02116

For defendant Kingswood Capital Partners LLC:

Daniel D'Costa, I
Zimmerman D'Costa LLP
315 Walt Whitman Rd, Suite 215
Huntington Station, NY 11746

For defendants Brag House Holdings Inc., Lavell Juan Malloy, II, Daniel Leibovich, Malloy Family Trust, and Leibovich Family Trust:

Jonathan Uretsky
PULLP
111 Broadway, 8th Floor
New York, NY 10006

DENISE COTE, District Judge:

This securities lawsuit brings claims against Brag House Holdings, Inc. ("Brag"), two of its senior executives and their trusts, and Brag's underwriter. The plaintiffs, individual investors residing in Hong Kong, allege that defendants made a series of misrepresentations in connection with Brag's initial public offering (IPO) rendering them liable under § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(2), or, in the alternative, liable for fraud under § 10(b) of the Exchange Act, 15 U.S.C. § 78j. Plaintiffs also bring state law claims stemming from the same conduct. The underwriter and the Brag defendants have moved to dismiss each of plaintiffs' claims. For the following reasons, defendants' motions to dismiss are granted.

## Background

The following facts are drawn from the amended complaint ("FAC") and documents incorporated into the FAC by reference. See Bellin v. Zucker, 6 F.4th 463, 473 (2d Cir. 2021). The FAC's factual allegations are accepted as true for purposes of deciding this motion, and all reasonable inferences are drawn in the plaintiffs' favor.

I. Brag's IPO

Brag is a Delaware corporation that developed a social platform for video games and electronic sports aimed at college students. It was co-founded in 2021 by defendants Lavell Juan Malloy, II ("Malloy"), who became Brag's CEO, and Daniel Leibovich ("Leibovich"), who became Brag's COO (together, "individual defendants"). The individual defendants' respective trusts, Malloy Family Trust and Leibovich Family Trust, are also named as defendants. In 2022, Brag filed a confidential draft registration statement with the Securities and Exchange Commission ("SEC") with the goal of taking the company public via an IPO. Brag was unsuccessful in that effort in 2022 and the first half of 2023.

In October 2023, Brag filed a revised confidential draft registration statement with the SEC and renewed its efforts to drum up interest in its IPO. That draft registration statement disclosed, inter alia, that it had only 1,236 members on its platform as of December 31, 2022 -- and zero members that paid for any of its premium tiers -- and that its operating costs far exceeded the revenues to date, resulting in an accumulated deficit of over $6 million as of December 31, 2022.

On January 29, 2024, Brag filed an amended registration statement identifying defendant Kingswood Capital Partners LLC

("Kingswood") as the underwriter for the IPO. On June 18, 2024, Brag filed its final registration statement with the SEC, which it subsequently amended several times. In its final pre-IPO amendments to its prospectus, filed on February 11, 2025, Brag disclosed that it had only 2,000 members as of December 31, 2024, and that its accumulated deficit as of September 30, 2024 was over $14 million.

The SEC issued a notice of effectiveness on February 14, 2025. The IPO ultimately closed on March 5, and Brag's shares began trading on the NASDAQ on March 6 under the ticker symbol "TBH".

On April 1, Brag filed a notice with the SEC stating that it would not be able to timely file its Form 10-K. The price of Brag's shares fell 80% on the news.

Subsequent to the filing of this action, on June 30, 2026, Brag merged with a company called House of Doge. The post-merger entity trades on the NASDAQ under the ticker "HODO."

## II. Plaintiffs' Investments in Brag

Subsequent to the filing of its draft registration statement in October 2023, Brag began to seek outside investors for its IPO. One such investor was what the FAC describes as "an international investment firm with valuable relationships and contacts in the Asian high net worth investor community"

(hereinafter "Investment Firm"). According to the FAC, beginning in November 2023, Brag sought to persuade the Investment Firm either to invest directly in Brag's IPO or to introduce Brag to high net worth individuals that might be interested in investing in the IPO. The FAC alleges that, through its "executives," the Investment Firm acted as an "intermediary" for plaintiffs (hereinafter "Firm's Executive" or "Firm's Executives").[1]

Malloy was introduced to the Firm's Executives via Evan Greenberg, the president of Brag's broker. Greenberg's November 28, 2023, introductory email stated that the Firm's Executives "ha[ve] investors for The Brag House." On December 29, 2023, Malloy sent those Executives a "Summary of [Brag's] Business and a Proforma." According to the FAC, "Malloy knew that those executives would be passing those materials, as well as any other company-related information that Malloy provided, to any high net worth investors for whom the executives were acting as intermediary." In October 2024, the Investment Firm began conducting "due diligence on Brag in earnest," including through

[1] Plaintiffs' opposition to Brag's motion to dismiss identifies the Investment Firm as "Synergy Resources, Inc." and its executives as Peter Chun and Christopher Nichols. The FAC's narrative does not distinguish between either of these executives, instead referring to the Investment Firm's "executives" or sometimes "an executive." This Opinion adopts that nomenclature.

in-person meetings with Malloy, Leibovich, and the president of investment banking at Kingswood.[2]

The business and financial information "failed to convince any Plaintiff that passively investing in Brag's IPO would be a wise decision," which the Investment Firm conveyed to Malloy, Leibovich, and the Kingswood president. But the Investment Firm had another idea. It proposed to Brag an investment structure that contemplated that, after the IPO was completed, all of Brag's assets and liabilities would be spun off into a new entity, leaving the IPO investors with an empty (and debtless) corporate shell. Specifically, the proposed transaction, which the Investment Firm detailed to Brag in a series of meetings with Brag or Brag's counsel in late 2024, involved a multistep process. First, plaintiffs would collectively purchase 50% of Brag's IPO shares at $4 per share for a combined price of over $3 million. Second, shortly after the IPO, all of Brag's pre-IPO assets and liabilities and $2 million of the IPO proceeds would be transferred to a newly created private company that would be spun off from Brag. Brag's pre-IPO shareholders -- including Malloy and Leibovich -- would be the sole owners of the new company. Finally, "Brag's pre-IPO shareholders then

[2] Plaintiffs' opposition to Kingswood's motion to dismiss identifies this person as "Ariel Imas," and refers to Imas as a "director" rather than a "president."

would transfer or cause to be transferred to Plaintiffs (or, alternatively, to cancel voluntarily) all of their pre-IPO shares in Brag, in exchange for Plaintiffs' shares" in the newly created company. The goal of the contemplated transactions was that plaintiffs would get "substantial ownership" in the publicly-traded version of Brag, which would have "the lion's share of its IPO proceeds" but no assets or liabilities. In turn, Brag's pre-IPO shareholders -- including Malloy and Leibovich -- would own the newly created private company that essentially mirrored Brag pre-IPO, plus a cash infusion of some of the IPO proceeds.

On January 8, 2025, a Firm Executive followed up with Brag's counsel via email. The Executive wrote: "We are ready to move forward with Brag ASAP and would appreciate your guidance on the necessary steps and timelines for finalizing the sale of the company immediately following the IPO and subsequent establishment of a new Brag subsidiary that will either pursue its own IPO ASAP or spin off into a new listing and close another round of funding." The Firm's Executives subsequently "had multiple additional conversations (some oral, some written)" with Malloy, Leibovich, the Kingswood president, and Brag's counsel in which the Brag team "repeatedly assured the [Investment Firm] executives that Brag would agree to the

spinoff/share transfer and, in addition, that they would ensure that all of Brag's pre-IPO shareholders would vote in favor of the spinoff/share transfer as necessary and cause the transfer of their pre-IPO shares to Plaintiffs as part of the spinoff /share transfer." On January 28, the Firm's Executive emailed the Kingswood president listing "outstanding tasks" that needed to be completed before plaintiffs would "transfer funds," and Malloy, Leibovich, and the Kingswood president "informed" the Firm's Executive that they would complete those tasks. On or about February 4, 2025, the Kingswood president resigned from Kingswood, although the complaint avers that he "continued to work on the Brag IPO" after that date.

On February 17, 2025, the Firm's Executive wrote to Malloy to discuss the "mechanics of obtaining consent from Brag's pre-IPO shareholders either to cancel their shares in Brag after the close of the IPO or to transfer their shares to the IPO investors," accompanied by an "IPO & Post-IPO Flow Chart." In response, Malloy wrote: "Makes sense. Both [transfer and cancellation] work. Transfer actually may be a bit easier but they definitely both work." In the following days, Malloy advised the Firm's Executive that the share transfer would be effectuated by having the existing Brag shareholders execute a limited power of attorney form that would permit Malloy's

counsel to execute the transfers. The Firm's Executive followed up with Malloy multiple times over the subsequent weeks asking for the completed power of attorney forms, but Malloy did not provide them.

On February 27, Malloy "expressed concern that if the IPO did not close soon, NASDAQ might close Brag's IPO window, which would cause the IPO to fail and likely result in the collapse of the Company," and "began communicating with" the Firm's Executive on a WhatsApp thread that included the now-former Kingswood president. Malloy made representations that "he already had obtained signed power of attorney forms from pre-IPO shareholders who would hold a slight majority -- roughly 52% -- of Brag's shares after the close of the IPO," and argued that "having executed power of attorney forms from a majority of the Brag pre-IPO investors should be enough to convince Plaintiffs to consummate their IPO investments and wire their funds to Kingswood."

On March 2, after the Firm Executive inquired about the status of the power of attorney forms, Malloy stated that the Investment Firm would "have them tomorrow as promised"; the following day, Malloy reiterated that Brag would follow through with the post-IPO spinoff and stated that he and Leibovich had been working to convince Brag's shareholders to sign the power

of attorney forms, and that he had completed the forms for himself and his trust. On March 4, Malloy wrote to the Investment Firm that if Brag did not "have all the money in by tomorrow, we are in trouble." In the evening, Malloy stated in a WhatsApp message to the Firm's Executive that Brag had "well over 51 percent" of executed power of attorneys' forms, to which the Firm's Executive replied: "Yes!!! 54.50%" Throughout the evening, according to the complaint, "Malloy continued to represent to the executive that additional executed power of attorney forms had been obtained," and assured the Firm's Executive that none of the pre-IPO shareholders would "need to be managed." The Firm's Executive responded: "I[n] that case, we should be able to get 100%." Malloy replied: "If you do it like I told you and you let me handle it I can do it, I've always got a 100 percent. . . . We have control of the deal. The [IPO investors] can feel confident now."

On March 5, based on Malloy's representations, plaintiffs "closed on their IPO purchases and cause[d] more than $3 million to be wired to Kingswood." On March 16, the Firm's Executive expressed his frustration that Malloy had not taken action to effectuate the post-IPO spinoff transaction in a message to Malloy's counsel and the former Kingswood president, stating that Malloy "agreed to sell [Brag]"; that his failure to do so

"looks like outright theft"; and that Malloy "said he would never in a million years screw us, yet here we are."

On March 20, Malloy's counsel -- to whom the pre-IPO shareholders had supposedly been asked to transfer power of attorney -- informed the Firm's Executive that he had "received a written notice from [Malloy] withdrawing the" power of attorney forms, and that according to the former Kingswood president, Malloy was "aware he could revoke them."

Plaintiffs subsequently sold their shares on the NASDAQ for less than their purchase price. Although plaintiffs do not specify when they sold their shares, their complaint suggests it was sometime after August 11, 2025, when Brag filed a new registration statement with the SEC stating its intent to issue additional shares. Similarly, at some unspecified time after August 11, plaintiffs' counsel learned that one of Brag's pre-IPO shareholders, identified in the complaint only as a "London based private venture fund,"[3] had not been asked to execute a power of attorney form, which the complaint avers is "unequivocal proof that Malloy had made brazenly fraudulent statements" to the Investment Firm.

[3] Plaintiffs' opposition to Brag's motion to dismiss identifies the venture fund as Breakspear Ventures Ltd.

Plaintiffs filed this lawsuit on March 5, 2026. Kingswood filed a motion to dismiss on May 5, and plaintiffs filed the FAC on May 10. Kingwood filed a renewed motion to dismiss on May 27, and the Brag defendants filed a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., on June 1. The briefing was fully submitted on June 22.

## Discussion

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a party "must plead 'enough facts to state a claim that is plausible on its face.'" Green v. Dep't of Educ. of N.Y., 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "In determining if a claim is sufficiently plausible to withstand dismissal," a court "accept[s] all factual allegations as true" and "draws all reasonable inferences in favor of the plaintiffs." Melendez v. City of N.Y., 16 F.4th 992, 1010 (2d Cir. 2021) (citation omitted). In securities actions, a court "may also consider any

written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).

Where the plaintiffs plead causes of action sounding in fraud, Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies. To sustain their fraud claims, plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (citation omitted). The facts alleged must give rise "to a strong inference of fraudulent intent." Id. (citation omitted). "The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995) (citation omitted).

The Brag defendants' motion to dismiss first argues that the FAC as a whole fatally fails to allege any communications between any of the named plaintiffs and any defendant. As to the § 12(a)(2) claims, Brag argues that they fail because the alleged misrepresentations did not "relate to a prospectus," as required by § 12(a)(2), and because defendants did not directly solicit any of the named plaintiffs to purchase shares, rendering them improper § 12(a)(2) defendants. As to the § 10(b) claims and related common law fraud claims, Brag argues primarily that plaintiffs have failed to plead the required elements with particularity. Finally, Brag argues that the unjust enrichment claim is facially implausible and that plaintiffs have not pleaded a sufficient nexus with Delaware to sustain their claims under Delaware's securities laws.

After the Securities Act claims are addressed, this Opinion will turn to the Exchange Act claims. Finally, it will turn to the state law claims.

## I. Securities Act Claims

The plaintiffs allege that Brag, Malloy, Leibovich, and Kingswood are liable to them under § 12(a)(2) of the Securities Act of 1933. Section 12(a)(2) provides that "[a]ny person" who "offers or sells a security" by means of a "prospectus or oral communication" that "includes an untrue statement of a material

fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading" and who does not "sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission[] shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2). As such, "Section 12 imposes negligence liability." Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 129 (2d Cir. 2017) ("Nomura").

"Prospectus" within the meaning of § 12(a)(2) refers to "documents related to public offerings by an issuer or its controlling shareholders." Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 569 (1995). A prospectus must include the "information contained in the registration statement." Id. (citation omitted). The phrase "oral communication" within the meaning of § 12 refers only to "oral communications that relate to a prospectus." Id. at 567-68; see also Yung v. Lee, 432 F.3d 142, 147 n.5 (2d Cir. 2005).

Section 12 imposes liability without requiring "proof of either fraud or reliance," Gustafson, 512 U.S. at 582, and instead requires "only some causal connection between the alleged communication and the sale, even if not decisive."

Metromedia Co. v. Fugazy, 983 F.2d 350, 361 (2d Cir. 1992) (citation omitted). Plaintiffs also allege that Malloy and Leibovich are liable under § 15 of the Securities Act, which creates liability for individuals or entities that "control[ ] any person liable" under § 12. 15 U.S.C. § 77o(a).

A. Proper Section 12 Defendants

Brag argues that none of the defendants are proper § 12(a)(2) defendants because the plaintiffs do not allege that they were directly solicited to purchase a security by any defendant, as the alleged solicitations were all directed at the Investment Firm. As a general matter, § 12 claims may only be brought against so-called "statutory sellers," defined by the Supreme Court as (1) "the owner who passed title, or other interest in the security, to the buyer for value" or (2) someone "who successfully solicits the purchase [of the security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Pinter v. Dahl, 486 U.S. 622, 642, 647 (1988).[4] Thus -- in general -- under Pinter, a court considering whether a § 12 claim is

[4] Pinter technically concerned § 12(a)(1) rather than § 12(a)(2), but its reasoning is understood to extend to both subsections, as both subsections employ the operative phrase -- "any person who offers or sells a security" -- that the Supreme Court was construing. See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 49 (2d Cir. 1991); Nomura, 873 F.3d at 139.

adequately stated against a particular defendant must analyze whether the defendant directly passed title to the plaintiffs (e.g., an underwriter) or, if not, whether the defendant actively solicited the purchase while not acting as a representative of the plaintiff.

In 2005, however, the SEC promulgated Rule 159A, which provides that an issuer of securities is always considered a statutory seller for purposes of § 12(a)(2) regardless of the form of underwriting. See 17 C.F.R. § 230.159A(a). And the Second Circuit has held that Rule 159A obviates the need for a Pinter analysis of whether the issuer actively solicited the plaintiffs. In Nomura, the Second Circuit specifically rejected the argument that Rule 159A is foreclosed by Pinter, reasoning that "Pinter actually stands for the proposition that the Securities Act is ambiguous as to the definition of statutory seller." 873 F.3d at 139-40. It therefore held that Rule 159A imposes liability on depositors of asset-backed securities in light of Pinter's "understanding of the expansive definition of statutory seller." Id. at 140. Subsequent to Nomura, district courts in this Circuit treated Rule 159A as determinative on the question whether an issuer is a statutory seller. See, e.g., Zornberg v. NAPCO Security Techs., Inc., 778 F.Supp.3d 516, 531 (E.D.N.Y. 2025); Sharma v. Rent the Runway, Inc., 751 F.Supp.3d

82, 121 (E.D.N.Y. 2024). Although the decision in Nomura proceeded via the now-defunct Chevron framework, its decision remains binding. See Garcia Pinach v. Bondi, 147 F.4th 117, 131-32 (2d Cir. 2025) (explaining that Loper Bright does not stand for the proposition that any case that relied on Chevron deference is no longer binding precedent). Thus, Brag is a proper defendant under § 12(a)(2).

Kingswood is also a proper defendant because the FAC may be read to plead that Kingswood was a "firm commitment" underwriter in relation to the IPO.[5] The FAC also plausibly alleges that the individual defendants were personally engaged in solicitation and therefore could be liable under § 12(a)(2). While liability cannot attach to those "who merely assist in another's solicitation efforts," Pinter, 486 U.S. at 651 n.27, the FAC alleges that both Malloy and Leibovich conveyed the alleged misrepresentations to solicit the plaintiffs' participation in the IPO. See Capri v. Murphy, 856 F.2d 473, 478 (2d Cir. 1995) (holding that defendants who prepared a misleading prospectus

[5] In a firm commitment underwriting, "the underwriter agrees to purchase an agreed upon percentage of the offering irrespective of whether the securities can be sold in the public market; therefore, the underwriter bears the risk if the offering is undersubscribed." Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 701 (2d Cir. 1994). The underwriter can therefore be liable under § 12(a)(2) as a "seller" for direct sales to the public. In re WorldCom, Inc. Sec. Litig., 294 F.Supp.2d 392, 409 (S.D.N.Y. 2003).

that was distributed to plaintiffs by a third party at the behest of the defendants were statutory sellers).

Brag argues that there is insufficient evidence of solicitation by any of the Brag defendants because the FAC does not claim that the Brag defendants communicated directly with any of the plaintiffs. Instead, the FAC only describes misrepresentations to and other communications with the Investment Firm. But, as discussed, Brag is a statutory seller under Rule 159A. And Brag points to no authority suggesting that a defendant's solicitation activities must be directed at the particular plaintiffs that file suit; the crux of the inquiry focuses on whether a defendant "successfully solicit[ed] the purchase" at all. See Capri, 856 F.2d at 478. After all, a plaintiff need not plead reliance to pursue a Securities Act claim. Gustafson, 512 U.S. at 582.

B. Free Writing Prospectuses

Plaintiffs do not allege that anything in the prospectuses that Brag filed with the SEC contained any misrepresentations. Instead, they argue that "the emails and WhatsApp messages" sent by Malloy to the Investment Firm in relation to the spinoff transaction constitute "prospectuses" within the meaning of § 12(a)(2). In opposition to the Brag defendants' motion to dismiss, plaintiffs argue more specifically that defendants'

written communications to the Investment Firm constituted misleading "free writing prospectuses," referring to an SEC rule that permits certain issuers to make initial written offers of securities via a "free writing prospectuses" that is more casual than a full-throated statutory prospectus. Nomura, 873 F.3d at 148-49.

The SEC introduced the concept of a free writing prospectus in 2005, as part of a package of reforms aimed at modernizing the rules that govern the marketing of securities. SEC Release No. 75, 85 S.E.C. Docket 2871, 2005 WL 1692642, at *18 (July 19, 2005) ("SEC Release"). As the issuing release explained, the goal of these reforms was to increase the timely flow of information to investors during a registered offering, with the goal of allowing the market to make more accurate and better-informed investment decisions while maintaining investor protection against misleading or inaccurate disclosures. Id. at *119-21.

As relevant here, SEC Rule 405 set forth the concept of a free writing prospectus, defined as "any written communication . . . that constitutes an offer to sell or a solicitation of an offer to buy the securities relating to a registered offering that is used after the registration statement in respect of the offering is filed," unless the

communication falls into certain other categories. 17 CFR § 230.405. A "written communication" is defined, in turn, as "any communication that is written, printed, a radio or television broadcast, or a graphic communication"; a graphic communication is defined to include "all forms of electronic media, including, but not limited to," as relevant here, "electronic mail, Internet Web sites, substantially similar messages widely distributed (rather than individually distributed) on telephone answering or voice mail systems, computers, computer networks and other forms of computer data compilation." Id. As the issuing release explained, liberalizing the types of communications that issuers and underwriters may use to solicit the sale of securities could, for example, enable issuers and underwriters "to provide proprietary analytical material that is specifically tailored to address the particular asset allocation considerations of different investors." SEC Release at *120.

To the extent a free writing prospectus contains a material misrepresentation, an issuer may be liable under § 12(a)(2), because "a sale procured through the issuance of a free writing prospectus is a sale made 'by means of' a prospectus" within the meaning of § 12(a)(2). Fed. Housing Fin. Agency v. Bank of Am. Corp., No. 11cv6195, 2014 WL 7232339, at *5 (S.D.N.Y. Dec. 18,

2014); see also SEC Release at *78 & n.419. As the issuing release put it, "[a] free writing prospectus can take any form," id. at *38, including emails, and there are no hard and fast rules that determine what written communications constitute free writing prospectuses. Instead, "[a] written communication will be a free writing prospectus only where it constitutes an offer by an offering participant of a security under the Securities Act," and "[w]hether a particular communication constitutes such an offer will continue to be determined based on the particular facts and circumstances." Id.

Although a free writing prospectus may take a variety of forms, they all must adhere to requirements set forth in Rule 433. They may only be used after the registration statement and base prospectus are filed. 17 C.F.R. § 230.433. They must, inter alia, contain a legend that directs the recipient to the registration statement and base prospectus, 17 C.F.R. § 230.433(c)(2)(i), and may not conflict with information in the registration statement. Id. § 230.433(c)(1). Moreover, non-reporting issuers may only use a free writing prospectus if it is "accompanied or preceded by" the most recent statutory prospectus. Id. § 230.433(b)(2)(i). Finally, any free writing prospectus that is "prepared by or on behalf of the issuer or used or referred to by the issuer" must be filed. Id.

§ 230.433(d), (h)(1); see also SEC Release at *47-*48. The filing requirement assures that the information is publicly available and enables "continuing Commission oversight and enforcement authority over the contents and use of the free writing prospectus." Id. at *121.

Plaintiffs insist that Brag's emails and WhatsApp messages representing that they would consummate the spinoff transaction were free writing prospectuses "because those communications solicited the plaintiffs' IPO purchases." But the Gustafson court specifically rejected the argument that "any written offer [to sell a security] is a prospectus under § 12." 513 U.S. at 572. Instead, to be actionable under § 12 the communications alleged to constitute a prospectus must also have "related to public offerings by an issuer or its controlling shareholders," namely, documents that are required to "include the information contained in the registration statement." Id. at 569. Thus, despite the "partial circularity" in the statutory definition, id. at 576, the relevant question under § 12(a)(2) is whether the communications alleged to be a prospectus relate to a formal public solicitation.

Here, there are no allegations that statements made by Brag about the spinoff transaction related to any of Brag's publicly filed disclosures or that they had to be publicly filed.

Indeed, the FAC alleges that upon review and discussion of the "draft S1" and the "relevant business and financial information," plaintiffs decided not to invest in Brag's IPO. Then, the Investment Firm originated the idea for a post-IPO transaction that would result in plaintiffs' owning an empty shell company with the bulk of Brag's IPO proceeds. The alleged misleading statements concerned only Brag's intention to effectuate the spinoff transaction and the steps it was taking to create the conditions for that transaction.

Such collateral communications -- even if the belief in a post-IPO transaction caused a plaintiff's IPO purchase -- do not constitute offers to sell a security in relation to a prospectus within the meaning of Gustafson. As Gustafson emphasized, § 12(a)(2) does not "create liability for misstatements contained in any written communication relating to the sale of a security," id. at 571 (emphasis added). Instead, a proper reading of the statute understands "the liability provisions of the 1933 Act as designed for the primary purpose of providing remedies for violations of the [registration and disclosure] obligations it had created." Id. at 572; see also id. at 578 ("It is understandable that Congress would provide buyers with a right to rescind, without proof of fraud or reliance, as to misstatements contained in a document prepared with care,

following well-established procedures relating to investigations with due diligence and in the context of a public offering by an issuer or its controlling shareholders.”). The Supreme Court applied this reasoning in Gustafson to hold that § 12(a)(2) does not apply to private offerings. Applied here, Gustafson stands for the proposition that where a misstatement does not relate to information an issuer was required to disclose but instead to, as Brag puts it, an unregistered “off-prospectus restructuring,” an injured plaintiff’s remedy does not lie in § 12(a)(2).

The purposes of the free writing prospectus regulation further confirm that these private communications -- largely driven by the investor rather than the issuer -- should not be interpreted as actionable prospectuses. The Commission clearly envisioned free writing prospectuses as documents that would contain more detailed and analytically tailored information relevant to investors, which would permit investors to more accurately value the securities. See SEC Release at *120. The information at issue here, about a transaction that would occur after the investors had purchased their securities, was essentially unrelated to anything about Brag’s value qua Brag.

The communications at issue here also notably lack the hallmarks of typical free writing prospectuses, bolstering the conclusion that they are not prospectuses at all. First, they

are not alleged to have conformed with the SEC requirement that any free writing prospectus contain a legend directing the recipient to its registration statement and base prospectus, or the requirement that a prospectus prepared by an issuer be publicly filed alongside the final terms of the offering. See 17 C.F.R. § 230.433. Although an issuer may of course issue a free writing prospectus that does not conform with SEC regulations (and is permitted to file corrective disclosures), it is telling that plaintiffs have failed to confront these requirements.[6]

Second, although industry practice is of course not determinative of the issue, typical free writing prospectuses take the form of presentations at electronic road shows (like slideshows), term sheets, summaries of offering terms, financial results, and media coverage. Indeed, Brag itself filed five free writing prospectuses between July 10, 2024, and February 4, 2025, each of which took the form of a slideshow that, in the first sentence of its first substantive page directed the reader to its registration statement and preliminary prospectus in accordance with Rule 433. That these private, informal

---

[6] Indeed, it seems plausible that plaintiffs would not have wished for these communications to become public via a contemporaneous SEC filing at all, in light of their goal to retain a portion of their investment and transform Brag into a vehicle for their own business purposes.

communications alleged in the FAC are so far afield from SEC rules and industry practice confirms that they are not the sort of communications that fall within the ambit of § 12(a)(2). It is hard to believe that Congress intended for § 12 liability to attach to private negotiations about a wholly post-IPO transaction. Accordingly, to the extent plaintiffs' § 12(a)(2) claim is premised on written communications about the spinoff transaction, the claim is dismissed.

C. The Oral Statements Do Not Relate to a Prospectus.

The FAC alleges that the "oral statements regarding Brag's commitment to the post-IPO spinoff/share transfer" that were made to the Investment Firm "during telephone calls, video conferences, and in-person meetings" were "in relation to a prospectus" within the meaning of § 12(a)(2) "because they modified and amplified the statements made in Brag's prospectuses regarding Brag's business plan and intended use of IPO proceeds," though the FAC does not identify what statements or prospectuses it is referring to. In response to Brag's motion to dismiss, plaintiffs argue more generally that the alleged misrepresentations -- which related only to the proposed post-IPO transaction -- go "to the heart" of the information issuers are required to disclose to prospective investors: "the

use to which the IPO proceeds will be put, and the issuer's business plan."

While, as a general matter, prospectuses must state "the principal purposes for which the net proceeds" from an offering will be used, 17 C.F.R. § 229.504, and Brag's registration statement indeed did so,[7] Gustafson does not imply that any misrepresentations about the future use of IPO proceeds necessarily relate to every prospectus that discussed the use of IPO proceeds generally. Where, as here, the oral misstatements are not alleged to have related to (or conflicted with) any particular prospectus (or statements contained therein), or been publicly filed themselves, Gustasfon's mandate that the oral communication "relate to a prospectus" is not satisfied. 513 U.S. at 567-68 (emphasis added). Plaintiffs' vague allegation that the alleged misrepresentations "modified and amplified the statements made in Brag's prospectuses regarding Brag's business plan and intended use of IPO proceeds" fails to allege misstatements related to a prospectus for the same reason.

[7] In Brag's final amended registration statement, filed on February 11, 2025, Brag stated that it intended to use the proceeds of the offering to (a) repay its debts and (b) for "working capital and general corporate purposes, including sales and marketing activities, product development and capital expenditures," but that the expected uses of the proceeds may change, and that "management will have broad discretion in the application of the net proceeds."

Again, as Brag points out, plaintiffs do not allege that Brag made any misrepresentations regarding its business plan and intended use of IPO proceeds in any publicly-filed prospectus. Nor is there an allegation that Brag ever publicly disclosed plaintiffs' preferred use of IPO proceeds or their plan to empty the business of its pre-IPO assets and liabilities. Plaintiffs' argument is essentially that the misrepresentations would have, if true, conflicted with something in Brag's statutory prospectus. Section 12(a)(2) does not create liability for such an attenuated theory of misrepresentation in relation to a prospectus. See Gustafson, 513 U.S. at 572 ("We are reluctant to conclude that § 12(2) creates vast additional liabilities that are quite independent of the new substantive obligations the Act imposes.").

Thus, the alleged oral communications do not relate to a prospectus within the meaning of § 12(a)(2).[8] Accordingly, Count One of the FAC is dismissed. Count Two, the § 15 control person claim, is also dismissed because it relies on an adequately-pleaded § 12 claim.

[8] If the oral statements did relate to the Brag prospectus, which they do not, it would be necessary to assess whether they were adequately pleaded under Rule 9(b) since they are premised on allegations of fraud. Rombach v. Chang, 355 F.3d 164, 171-72 (2d Cir. 2004).

II. Exchange Act Claims

Plaintiffs allege that, in the alternative to their § 12 claim, Brag, Malloy, Leibovich, and the Malloy and Leibovich trusts are liable to them under § 10(b) of the Exchange Act, which makes it unlawful to "use or employ, in connection with the sale of any security . . . any manipulative or deceptive device" in connection with the sale of a security. 15 U.S.C. § 78j(b). Plaintiffs also allege that Malloy and Leibovich are liable under § 20 of the Exchange Act, which creates liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act]." 15 U.S.C. § 78t(a).

> To succeed on a Section 10(b) claim, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

Gimpel v. The Hain Celestial Grp., 156 F.4th 121, 136 (2d Cir. 2025) (citation omitted). Claims for securities fraud are subject to Rule 9(b)'s heightened pleading standard. See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd., 19 F.4th 145, 150 (2d Cir. 2021).[9]

---

[9] The parties appear to assume that the Private Securities Litigation Reform Act ("PSLRA") applies to plaintiffs' claims in this case. But the PSLRA applies only to private actions

Plaintiffs' § 10(b) claim boils down to an allegation that the Brag defendants never intended to consummate the post-IPO spinoff transaction that would have resulted in plaintiffs' ownership of a publicly-traded shell company holding the bulk of the IPO proceeds, and instead only pretended to be interested in pursuing the spinoff transaction in order to get the plaintiffs (via the "intermediary" Investment Firm) to invest in the IPO. The FAC points to the following false or materially misleading "representations" by the Brag defendants: (1) "that they supported the spinoff/share transfer"; (2) "that they would obtain the approval of the Board of Directors to effectuate the spinoff/share transfer and the consent of Brag's pre-IPO shareholders to transfer their pre-IPO shares to Plaintiffs," (3) "that Malloy had obtained validly executed power of attorney forms from Brag's non-insider pre-IPO shareholders that would allow Malloy to transfer those shareholders' shares to Plaintiffs," and (4) "that the Malloy Family Trust and Leibovich Family Trust (which Malloy and Leibovich, respectively, solely controlled) would transfer or cause [Malloy's lawyer] to tran[s]fer the Trusts' pre-IPO shares to Plaintiffs."

---

brought as class actions, which this lawsuit is not. See 15 U.S.C. § 78u-4(a)(1). Because the PSLRA "effectively raised the nationwide pleading standard to that previously existing in this circuit," however, the pleading standards do not differ for the purposes of this motion. Novak, 216 F.3d at 310.

Plaintiffs' theory for why each of these statements was false when made appears to stem from the revelation (post-IPO, but otherwise at an unspecified time) that one of Brag's pre-IPO shareholders, the "London based private venture fund," had not been asked to execute a power of attorney form.[10] According to the FAC, this amounts to "unequivocal proof that Malloy had made brazenly fraudulent statements" to the Investment Firm in relation to the power of attorney forms, and forms the basis for plaintiffs' belief that Malloy "fabricated" all of the power of attorney forms he represented as having been executed by pre-IPO shareholders. As distilled in plaintiffs' opposition to the Brag defendants' motion to dismiss, this purported "fabrication" in turn forms the basis of the claim that they were defrauded.

The FAC asserts that on February 27, 2025 and again on March 4, which was the day before the plaintiffs purchased their IPO shares, Malloy assured the Firm's Executive that he had obtained power of attorney forms from 52% of the pre-IPO shareholders and then "additional" forms. The FAC does not assert that Malloy ever represented that the London-based fund

[10] The FAC represents that Malloy withdrew the power of attorney forms necessary to effectuate the share transfer on March 20, but does not point to that withdrawal as evidence that his prior statements were fraudulent.

had executed the forms or that that fund held more than 48% of Brag's shares.

The Brag defendants argue, inter alia, that the FAC fails to plead a strong inference of scienter, reliance, or loss causation. It is not necessary to reach defendants' arguments regarding scienter or loss causation because the FAC indeed utterly fails to adequately plead reliance in relation to any statement, written or oral.

Because plaintiffs do not allege statements that constitute public information, they disclaim a fraud-on-the-market theory of reliance. Thus, a plaintiff must plead that he or she was "aware of a company's statement and engaged in a relevant transaction -- e.g., purchasing common stock -- based on that specific misrepresentation." Halliburton Co. v. Erica P. John Fund, 573 U.S. 258, 267 (2014). None of the plaintiffs have done so. The FAC alleges only the plaintiffs as a group relied on defendants' representations as a whole. Plaintiffs' securities fraud claim fails for that reason alone.

Plaintiffs suggest that they are excused from the requirement to plead reliance because, as a general matter, misstatements are actionable under § 10(b)(5) even if they are not made directly to a plaintiff. See Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) ("There is no requirement

that the alleged violator directly communicate misrepresentations to investors for primary liability to attach.”). Plaintiffs misread Wright, which considered only whether a defendant accounting firm had made actionable misstatements purely by dint of having orally approved misleading financial statements that were subsequently included in an issuer’s press release. Id. at 171, 173-75. Wright does not displace plaintiffs’ obligation to plead their own actual reliance on particular misrepresentations. Indeed, Wright itself repeatedly emphasized the importance of pleading reliance in a § 10(b) cause of action. Id. at 174, 177.[11]

[11] Plaintiffs’ arguments in response to Brag’s contention that the entire FAC must be dismissed because none of the defendants ever communicated directly with the plaintiffs may also be read to suggest that they need not plead reliance. Plaintiffs argue that “a defendant who obtains a plaintiff’s money by means of false representations to the plaintiff’s agent cannot escape liability by arguing that the false representations were not made to the plaintiff directly.” But, as with Wright, even the source plaintiffs cite for this proposition emphasizes the requirement to show justifiable reliance, which plaintiffs here have not attempted to plead. Restatement (Second) of Torts, § 533 (“The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.”) (emphasis added).

Accordingly, Count Five of the FAC is dismissed. Count Six, the § 20 control person claim, is also dismissed because it relies on an adequately-pleaded § 10(b) claim.

III. Common Law Fraud Claim

Plaintiffs also bring a claim for common law fraud against each defendant except Kingswood, although they do not specify which state's law applies to this claim. The Brag defendants assume that New York law applies, which plaintiffs do not contest, so the Court likewise assumes New York law applies. See Chau v. Lewis, 771 F.3d 118, 126 (2d Cir. 2014). Under New York law, "[t]he elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559 (2009). Accordingly, the common law fraud claim must be dismissed for the reasons stated above. There are no allegations of justifiable reliance by any plaintiff.

IV. Unjust Enrichment Claim

The plaintiffs allege, in the alternative to their fraud claims, that Brag was unjustly enriched by the IPO proceeds it received from plaintiffs. The Court again assumes that New York law applies to these claims because Brag does and because

plaintiffs do not contest that assumption. "An unjust-enrichment claim under New York law requires the plaintiff to show that '(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.'" Delshah 60 Ninth, LLC v. Free People of PA LLC, 175 F.4th 192, 200 (2d Cir. 2026) (quoting Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182 (2011)).

Where an unjust enrichment claim merely repackages a plaintiff's fraud claim, New York courts dismiss the unjust enrichment claim as duplicative. See, e.g., SKYX Grp. Inc. v. Found. for a Smoke-Free World, 247 A.D.3d 487, 489 (1st Dep't 2026) ("The unjust enrichment claim was properly dismissed as duplicative of the fraud claim because they are based on the same facts."); Globalx, Inc. v. Hogwarts Capital, LLC, 226 A.D.3d 535, 536 (1st Dep't 2024) (same). As the New York Court of Appeals has explained,

> [U]njust enrichment is not a catchall cause of action to be used when others fail. It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled. An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.

Corsello v. Verizon N.Y., 18 N.Y.3d 777, 790 (2012) (citation omitted). While unjust enrichment may indeed be pleaded in the alternative under Rule 8(d)(2), federal courts applying New York law likewise dismiss unjust enrichment claims brought in the alternative when the claims rely on the same set of facts as a plaintiff's other claims. See, e.g., Bermudez v. Colgate-Palmolive Co., 667 F.Supp.3d 24, 46 (S.D.N.Y. 2023) (collecting cases).

Here, plaintiffs' unjust enrichment claim is based on the same facts underlying their fraud claims: namely, that "Brag failed to provide" to plaintiffs the promised "spinoff/share transfer that would result" in plaintiffs' substantial control of a liability free and cash-rich Brag. Accordingly, this claim may be dismissed as duplicative.

Even if the claim were not entirely duplicative, however, it fails on the merits. The doctrine of unjust enrichment is designed to remedy unwarranted windfalls, such that, as stated, "it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Delshah, 175 F.4th at 200 (citation omitted). Brag did not receive such a windfall: plaintiffs paid Brag money in exchange for Brag shares, and admittedly received those shares. Because plaintiffs received exactly what they bargained for, an unjust

enrichment claim does not lie. See, e.g., Hoberman v. Fishman, 304 A.D.2d 375, 376 (1st Dep't 2003) (holding that a plaintiff's unjust enrichment claim should have been dismissed where plaintiff "does not claim that it paid an unfair price" for life insurance policies or that it "did not receive the coverage it had bargained for," but merely that the policies were not appropriate investment vehicles). That the plaintiffs may have harbored specific hopes about the future of those shares does not mean that, when those hopes were not fulfilled, Brag was unjustly enriched. Accordingly, Count Three of the FAC is dismissed for this reason as well.

V. Delaware Securities Act Claims

Plaintiffs also allege that Brag, Malloy, Leibovich, and Kingswood are liable to them under the Delaware law analog to § 12(a)(2), 6 Del. C. § 73-605(a)(2), and the Delaware analog to § 10(b)(5), 6 Del. C. § 73-201. Even if plaintiffs had adequately pleaded those claims, the Delaware claims would fail because plaintiffs have failed to allege a factual nexus with Delaware sufficient to support application of the Delaware Securities Act. The only connection to Delaware alleged in the AC is that Brag is incorporated in Delaware. Under Delaware law, incorporation alone is insufficient to allege a nexus capable of stating a claim under the Delaware Securities Act.

FdG Logistics LLC v. A&R Logistics Holdings, Inc., 131 A.3d 842, 853-54 (Del. Ch. 2016), aff'd 148 A.3d 1171 (Del. 2016) (Table); see also Salzberg v. Sciabacucchi, 227 A.3d 102, 136 n.160 (Del. 2020) (approvingly citing the Chancery court's holding in FdG Logsistics); Singer v. Magnavox Co., 380 A.2d 969 (Del. 1977), overruled on other grounds by Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983) (originating rule distilled in FdG Logistics and explaining that traditional presumption that "a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted" applies to Delaware Blue Sky laws and holding that incorporation is not enough).

Plaintiffs protest that FdG Logistics (nor a Second Circuit summary order that affirmed a case from this district that relied on FdG Logistics, see SEC v. Bronson, 756 F. App'x 38, 40 (2d Cir. 2018)) did not specifically involve "a corporation's solicitation of purchases of its IPO shares." Plaintiffs point to this factual difference to assert that even though defendants "were not physically present in Delaware when they made their misrepresentations," there is a sufficient nexus with Delaware because the misrepresentations induced purchases of "Delaware securities" from a "Delaware corporation." But plaintiffs cite no authority establishing that the solicitation and purchase of what plaintiffs term "Delaware securities" renders this case

distinguishable from Singer and its progeny, particularly where, as here, plaintiffs specifically allege that Malloy and Leibovich reside in New York state and that Brag has a "fully remote work policy." In Singer, the plaintiff stockholders challenged the merger of a Delaware corporation but were "residents of Pennsylvania," were "not solicited in Delaware," the merger agreement was not negotiated in Delaware, and no "part of the 'sale' occurred" in Delaware. 380 A.2d at 981. The court held that the Delaware Securities Act did not apply to the dispute because, at bottom, it was over "an alleged fraud in Pennsylvania or over a contract made in New York." Id. at 982. See also Swipe Acquisition Corp. v. Krauss, C.A. No. 2019-0509-PAF, 2021 WL 282642, at *5 (Del. Ch. Jan. 28, 2021) ("[A] choice-of-law provision selecting Delaware law and parties incorporated in Delaware [] do not form a sufficient factual nexus to permit application of the Delaware Securities Act.").

Brag's securities are only "Delaware securities" because Brag is incorporated in Delaware, and nothing in the relevant case law suggests that Brag's mere pursuit of an IPO as a Delaware corporation (from outside of Delaware) renders these foreign plaintiffs' claims sufficiently related to Delaware. See FdG Logistics, 131 A.3d at 846 (noting the Delaware legislature intended the Delaware Securities Act to "regulate

intrastate securities transactions," not "interstate securities transactions"). Accordingly, Counts Four and Eight of the FAC are dismissed.

## **Conclusion**

The defendants' June 1, 2026 motions to dismiss are granted.[12] The Clerk of Court shall enter judgment for the defendants and close the case.

Dated: New York, New York
October 16, 2026

DENISE COTE
United States District Judge

[12] Because the arguments asserted by Brag in its motion to dismiss encompass the claims against Kingswood, it is not necessary to address Kingswood's separate arguments in favor of dismissal.